## BELL *v.* STATE.

### Opinion delivered November 8, 1915.

1. HOMICIDE—DEATH PENALTY—LIFE IMPRISONMENT.—Act No. 187, p. 774, Acts 1915, which provides "that the jury shall have the right in all cases where the punishment is now death by law, to render a verdict of life imprisonment in the State Penitentiary at hard labor," *held* not to abolish capital punishment, but to provide also another method of punishment if the jury so ordained.

2. LEGISLATIVE ACTS—INTENTION—HOW ASCERTAINED.—To ascertain the Legislature's intention courts may look to the legislative proceedings as set forth in their journals.

3. STATUTES—REPEAL—CAPITAL PUNISHMENT.—Repeals by implication are not favored and the law imposing capital punishment for the commission of certain offenses, Kirby's Digest, § 1775; Act 55 Acts 1913, will not be held to be repealed by Act 187, p. 774, Acts 1915.

4. COURTS—SPECIAL TERMS—MAY BE HELD, WHEN.—The terms upon which special terms of the circuit court may be held, are provided in the act of February 28, 1838, and digested as sections 1532 to 1537 of Kirby's Digest, and the act not having been repealed, continues in force, under the provisions of section 1 of the schedule of the Constitution of 1874.

5. COURTS—SPECIAL TERMS—LEGALITY.—There is nothing in the present organic law of the State, that inhibits the Legislature from authorizing circuit judges to prescribe or fix the times and places for holding special terms of circuit courts, and when these times and places are fixed by the circuit judges in the manner provided by the statute, such times and places are as much prescribed by law as if the Legislature itself had so fixed the time.

6. COURTS—SPECIAL TERM—JURISDICTION IN CRIMINAL CASE—RECORD.— Every fact essential to give the circuit court jurisdiction to try a criminal indictment at a special term must be made to appear of record.

7. COURTS—SPECIAL TERMS—ENTRY OF CLERK.—Under Kirby's Digest, § 1532, which provides that a circuit judge may hold a special term to try a person confined in jail, by making a written order to that effect and transmitting it to the clerk, who shall enter the same on the records of the court, the circuit judge, when he convenes the court in special session, may ascertain from the clerk, who made the record entry, as to when the same was made, and may require the clerk to record his certificate at that time, showing that the order had been entered of record ten days before the special session began.

8. CRIMINAL LAW—SPECIAL TERM—ORDER—SEVERAL CRIMES.—An order of a circuit judge calling a special term of the circuit court to try defendant who was accused of murder, is sufficient to put the accused upon notice of the crime which he was charged to have committed, and when at the special term he was indicted for the commission of more than one murder.

9. HOMICIDE—CAPITAL PUNISHMENT—COMPETENCY OF JUROR.—Capital punishment being the law in this State, where trial juries may return a verdict which would result in capital punishment, the State, in the trial of cases when the death penalty may be imposed, is entitled to a jury that has no conscientious scruples as to such penalty.

10. HOMICIDE—TWO KILLINGS—PLEA OF FORMER CONVICTION.—The conviction of defendant for the murder of A. would not be a bar to his trial and conviction for the murder of B., when the killings were not simultaneous, nor the result of one shot, but were the results of entirely separate acts.

11. HOMICIDE—TWO KILLINGS—TWO CONVICTIONS.—The fact that appellant was convicted and was then undergoing life imprisonment for the murder of A. would not preclude his being tried and, after verdict, suffering the death penalty, for the murder of B.

12. TRIAL—ADMISSION OF INCOMPETENT TESTIMONY—NECESSITY FOR PROMPT OBJECTION.—Where incompetent testimony has been introduced, without objection by appellant, a subsequent motion to exclude such testimony is addressed to the discretion of the court, and it will be

held that the court did not abuse its discretion where the appellant himself elicited a portion of the incompetent testimony.

13. EVIDENCE—HYPOTHETICAL QUESTION—ISSUE BASED ON INCOMPETENT TESTIMONY.—Where incompetent testimony has been admitted without objection in a criminal trial, a hypothetical question, propounded to medical experts, taking into consideration the facts shown by the aforesaid incompetent testimony, will not be held to be improper.

14. EVIDENCE—HYPOTHETICAL QUESTION—MUST STATE WHAT FACTS.—The hypothetical question to be propounded to expert witnesses must contain all the undisputed facts shown by the evidence.

15. EVIDENCE—HYPOTHETICAL QUESTION—DUTY TO OBJECT SPECIFICALLY.— A specific objection to an hypothetical question on the ground that it omitted facts shown by the undisputed evidence, to be availing, must be made when the question is propounded to the witness, and an objection thereto can not be raised for the first time on appeal.

16. TRIAL—ARGUMENT OF COUNSEL—INCOMPETENT TESTIMONY.—When incompetent testimony has been introduced without objection, it is not improper for counsel to comment on the same in argument.

17. HOMICIDE—PLEA OF INSANITY—BURDEN OF PROOF.—The law presumes that every man is sane and that he intends the natural consequences of his acts; and when one is charged with the commission of the crime of murder in the first degree, and it is admitted that if sane he is guilty as charged, and the plea of insanity is interposed as his defense, the burden is upon the accused to establish his insanity by a preponderance of the evidence.

18. HOMICIDE—PLEA OF INSANITY—WHAT WILL CONSTITUTE A DEFENSE.— Where an accused is on trial for murder in the first degree and the State proves the killing under circumstances that would constitute murder in the first degree if the homicide was committed by a sane person, then if the killing is admitted and insanity is interposed as a defense, such defense can not avail unless it appears from a preponderance of the evidence, *first*, that at the time of the killing that the defendant was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, *second*, if he did know it, that he did not know that he was doing what was wrong; or, *third*, if he knew the nature and quality of the act, and knew that it was wrong, that he was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done, and unable, because of the disease, to resist the doing of the wrong act which act was the result solely of his mental disease.

19. MEDICAL JURISPRUDENCE—"PARANOIA" DEFINED.—The disease called "paranoia" manifests itself and is characterized by systematized illusions; that is, a delusion based on false premises pursued by a logical process of reasoning to an insane conclusion.

20. CRIMINAL LAW—INSANITY AS DEFENSE—PASSION.—One who is otherwise sane will not be excused from a crime he has committed while his reason is temporarily dethroned, not by disease, but by anger, jealousy or other passion.

21. HOMICIDE—PLEA OF INSANITY—DEFENSE.—If an accused at the time of committing the homicide, by reason of a perverted and deranged mental condition, either partial or general, caused by a disease of the mind, was incapable of deliberating or premeditating as to the commission of this particular act, then he was not guilty of murder in any degree and should have been acquitted outright.

22. INSANITY—PLEA OF—KNOWLEDGE OF VIOLATION OF THE LAW.—Mental capacity to know that one's acts are in violation of the law is not one of the tests of insanity.

23. HOMICIDE—PLEA OF INSANITY—KNOWLEDGE OF RIGHT AND WRONG.—Whether accused was capable of distinguishing right from wrong in the general affairs of life, is not a test of his sanity, when the same is put in issue in a prosecution for homicide.

24. HOMICIDE—PLEA OF INSANITY—TESTS—INSTRUCTIONS.—In a prosecution for homicide, when the plea of insanity is interposed, even though all the tests on that plea may have been correctly stated in some of the instructions given at the request of the defendant, that fact would not cure the error of omitting them from instructions given at the request of the State, declaring what was necessary to be proved by the defendant, before his defense of insanity could avail him.

25. TRIAL—ARGUMENT OF COUNSEL—DUTY TO OBJECT.—It is the duty of appellant to object to improper argument of the prosecuting attorney, at the time the same is made, when the argument is not supported by any testimony offered in evidence, unless the argument is so flagrant that it would be reversible error for the court, on its own motion, to fail to exclude the argument.

Appeal from Conway Circuit Court; *M. L. Davis*, Judge; reversed.

STATEMENT BY THE COURT.

On the 5th of May, 1915, Hon. M. L. Davis, judge of the Fifth Judicial Circuit, called a special term of the Conway Circuit Court to meet on the 18th of May. The call recited that Sam Bell was accused of murder and confined in jail, and that the call was made for the purpose of investigating and disposing of the charge. The special term convened on the day ordered in the call, and a grand jury was empanelled, which returned four separate indictments against Bell, charging him with the crime of murder in the first degree by shooting different

persons. Among the indictments was one charging him with the murder of Eard Bearden, and also the present indictment, charging him with the killing of Mrs. Abbie Bearden by shooting her.

The indictment was couched in the usual terms of an indictment for murder in the first degree and no objection is urged to its sufficiency so far as the form of the indictment is concerned. The special term adjourned to and reconvened on June 1.

The appellant filed a plea of former conviction, setting up that at the present special term he had been indicted for the murder of Eard Bearden and Mrs. Abbie Bearden; that he was tried and convicted of murder in the first degree for the killing of Eard Bearden, and that the State was then proceeding to try him for the murder of Mrs. Abbie Bearden; that the killing of the two persons was but one transaction and constituted one offense; that the proof to sustain one would sustain the other; that his conviction of the killing of Eard Bearden was also tantamount to convicting him of the killing of Abbie Bearden, for which he was about to be tried. The plea of former conviction was overruled.

Appellant moved to quash the indictment, setting up that the record of the court did not show that the order calling the special term was entered on the record of the court ten days before the meeting of the special term. The motion was overruled.

Appellant was put upon his trial and the jury returned a verdict of murder in the first degree. Appellant filed his motion for a new trial, which was overruled, and judgment sentencing him to be electrocuted was rendered, and he duly prosecutes this appeal. Other facts will be stated in the opinion.

Appellant urges numerous grounds for reversal. Such of these as we deem necessary we shall consider in the opinion, and, for the most part, in the order presented by appellant's counsel.

*Mehaffy, Reid & Mehaffy* and *Sellers & Sellers,* for appellant.

1. Capital punishment was abolished by the act of March 20, 1915. It is exclusive and covers the whole subject-matter, and repeals by implication all former acts. 107 Ark. 384; 82 *Id.* 302; 80 *Id.* 411; 65 *Id.* 508; 57 *Id.* 508; 31 Am. Dec. 323; 39 So. 509; 31 Ark. 236; 29 *Id.* 248; 64 *Id.* 83.

2. There is now no law providing for special terms, § 1532 and others having been repealed. 49 Ark. 111; 46 *Id.* 229; 32 *Id.* 677; 136 Pac. 52; 105 N. E. 916; 5 Cal. 112; 106 N. Y. Sup. 624; 88 Ark. 324. If not repealed the proceedings are void for informality. 2 Ark., *Dunn* v. *State;* 45 Ark. 453; 100 *Id.* 377; 176 S. W. 165.

3. The court could only try one case against appellant. 176 S. W. 167.

4. The motion to quash the special venire should have been sustained. Const. 1868, § 32; Acts 1871, 266; Crim. Code, § 191; Kirby's Dig., § 2345, 4508; 24 Cyc. 229; 26 S. W. 388.

5. It was error to sustain the State's challenge for cause, as capital punishment had been abolished. Authorities, *supra;* 76 N. W. 327; 60 *Id.* 119; 57 *Id.* 414.

6. The State's opinion evidence was incompetent. 87 Ark. 293; 103 *Id.* 196; 61 Ark. 246; 103 *Id.* 200; 54 *Id.* 588.

7. The conduct and arguments of the counsel for the State were improper and prejudicial. 62 Ark. 126, 516; 74 *Id.* 256; 70 *Id.* 306; 77 *Id.* 238; 65 *Id.* 625; 75 *Id.* 577; 80 *Id.* 23; 81 *Id.* 231.

8. The instructions for the State were involved, confused and conflicting, and do not correctly state the law. 50 Ark. 518; 64 Ark. 534; 98 *Id.* 138; 54 *Id.* 600. Especially is this true as to the charge on insanity. 94 Am. St. 432; 55 Ky. 592; 71 *Id.* 463; 68 *Id.* 362; 107 *Id.* 624; 55 S. W. 196; 75 Am. St. 537; 96 N. W. 424; 165 U. S. 373; 102 Ark. 630; 104 *Id.* 67; 100 *Id.* 433; 101 *Id.* 37; 94 *Id.* 282; 95 *Id.* 506; 96 *Id.* 311; 99 *Id.* 377.

9.   It was error to refuse defendant's instructions. 60 Ark. 567; 59 *Id.* 431; 87 *Id.* 264.

10.   Defendant's insanity was sufficiently shown to justify a reversal. Taylor on Med. Jur. 740, 784-5; Wharton & Stille, Med. Jur., Vol. 1, § § 384-390; Blandford on Insanity, Vol. 12, p. 103.

11.   Appellant did not have a fair and impartial trial.   121 Pac. 58; Kirby's Dig., § 2422.

12.   The plea of former conviction should have been sustained.   It was in the record.   Kirby's Dig., § 2333; 32 Ark. 203; 22 Cyc. 393; 32 Ark. 246; 61 *Id.* 88; 42 Ind. 99.

13.   Having already been sentenced to life imprisonment, the sentence of death was void.   12 Cyc. 782, note 94; 17 Pa. Sup. Ct. 340; 101 Pa. 119; 28 Pa. Sup. 563; Endlich, Int. Stat., § 563.

14.   Appellant was insane, and a jury should have been empaneled to inquire into his sanity before sentence.   77 Ark. 418.

*Wallace Davis,* Attorney General, *Jno. P. Streepey,* assistant, for appellee; *W. P. Strait* and *Edward Gordon,* of counsel.

1.   Capital punishment has not been abolished.   101 Ark. 238.   The act simply gave the jury discretion to impose a life imprisonment verdict instead of death.

2.   The law providing for a special term of court has not been repealed.   24 Ark. 286-8; 1 Ore. 51; 2 Ia. 270, 275; 102 N. W. 885; Const. Ark., art. 7, § 12; 101 Ark. 238.

3.   The proceedings are not void for informality. 53 Pac. 563; 169 Mo. 615; 176 S. W. 165.

4.   The court had authority to try Bell in the second case.   Kirby's Dig., § 1532; 2 Ark. 230.

5.   The motion to quash the special venire was properly overruled.   Const. 1868; Acts of 1871; Kirby's Dig., § § 4500, 4504-6-9, 1533; 91 Ark. 582; 97 *Id.* 131-133.

6.   There is no error as to the grand jury.   Kirby's Dig., § 1533.

7. There was no error with regard to the State's challenges for cause. Kirby's Dig., § 2363, clause 7; 67 N. E. 453; 2 Cal. 257; 41 Tex. 86; 42 Neb. 503; 59 Miss. 19; 85 Pac. 948; 100 Ky. 133.

8. The court did not err with regard to the State's opinion evidence. 103 Ark. 165, 171; 106 *Id.* 362, 368.

9. The nonexpert testimony was proper. 106 Ark. 362; *Dewein* v. *State, infra* p. 302.

10. There was no misconduct of counsel which requires reversal. 103 Ark. 165, 171.

11. There was no incompetent testimony. 103 Ark. 171.

12. As to the insanity of the defendant, the verdict is conclusive. 109 Ark. 130; *Ib.* 138; *Dewein* v. *State, infra* p. 302.

13. The instructions were approved in 77 Ark. 426. They follow the law. 106 Ark. 362, 369.

14. There is no error as to the sentence. 12 Cyc. 782, note 94, and cases, *supra.*

15. The plea of former conviction was properly overruled. 52 Am. Rep. 295; 20 So. 632; 62 S. W. 915.

WOOD, J. I. The appellant contends that the judgment sentencing him to be electrocuted is void under the act of March 20, 1915, which is Act No. 187 of the Acts of 1915, at page 774. The act is entitled, "An Act giving the jury the right to render a verdict of life imprisonment in the State penitentiary in all cases where the punishment is now death by law." The act provides:

"Sec. 1. That the jury shall have the right in all cases where the punishment is now death by law to render a verdict of life imprisonment in the State penitentiary at hard labor.

"Sec. 2. That all laws and parts of laws in conflict herewith are hereby repealed."

(1-2) At the time of the passage of this act the only punishment for murder in the first degree was death by electrocution. Kirby's Digest, Sec. 1775; Act 55, Acts of 1913. Prior to the passage of the act under review, if the jury returned a verdict of guilty of murder in

the first degree the exclusive punishment as the result of such verdict was death.

The act under consideration conferred upon the jury a right that it did not have before, to-wit, the right to render a verdict of life imprisonment in all cases where the punishment under the then existing law was death. But this act was not intended to provide an exclusive method of punishment in those cases where, under the then existing law, the punishment was death.

Appellant contends that the act should be construed as if it read, "The jury shall, in all cases where the punishment is now death by law, render a verdict of life imprisonment in the State penitentiary at hard labor." But this is not a correct version of the act, for it places upon it a meaning entirely different from that conveyed by the language actually used. Saying that the jury "shall have the right to render a verdict" is quite a different thing from saying that the jury "shall render a verdict." The very language "shall have the right" denotes that the Legislature intended to confer upon the jury the option or privilege of rendering a verdict, whereas saying that the jury "shall" render such verdict denotes that they would not have any option. Such is the plain meaning as gathered from the language used. The manifest purpose of the Legislature was not to abolish capital punishment, but to provide also another method of punishment if the jury so ordained. If the Legislature had intended to abolish capital punishment the title of the act doubtless would have been "An Act to Abolish Capital Punishment," etc., and in the body of the act the Legislature would have made it compulsory on the jury to return a verdict fixing the punishment at imprisonment in the State penitentiary. That the Legislature would have so enacted if such had been their purpose clearly appears by a bill that was introduced at the same session of the Legislature to abolish capital punishment, etc., which bill it did not enact into law, but, on the contrary, enacted the present statute. Senate Bill 130, by Senator Owens. To ascertain the Legisla-

ture's intention courts may look to the legislative proceedings as set forth in their journals. See *Hartford Fire Ins. Co. v. State*, 76 Ark. 303-9, and cases cited.

(3) Repeals by implication are not favored, and the present law imposing capital punishment for the commission of certain offences should not be held to be repealed except by a law in express terms to that effect; or by necessary implication, as where the statutes are in invincible conflict; or where the later statute has covered the whole subject-matter of the prior law. As we construe it, the statute under review has no reference whatever to the abolition of capital punishment.

(4) Section 12, article 7 of our Constitution provides: "The circuit courts shall hold their terms in each county at such times and places as are, or may be, prescribed by law."

Appellant contends that under this section of the Constitution there is no law authorizing the holding of special terms of the circuit court. At the time of the adoption of the Constitution of 1874 the law provided that, "The judge of any circuit court may at any time hold a special term," (under certain circumstances), and provided the methods for convening such special terms. The statute prescribing the method for convening these special terms is a part of the revised statutes, and was a part of the act approved February 28th, 1838, and has been redigested in the various digests since the revised statutes and is found in chapter 47 in sections 1532 to 1537, inclusive, of Kirby's Digest.

Section 1 of the schedule of our Constitution provides: "All laws now in force which are not in conflict or inconsistent with this Constitution shall continue in force until amended or repealed by the General Assembly."

These provisions, providing for the holding of special terms, have not been repealed or amended by the General Assembly, and hence, by the express provisions of the Constitution, they continue in force to this day. They have been recognized as existing law in various deci-

sions of this court, beginning as early as *Dunn* v. *State,* 2 Ark. 230 (a decision under the Constitution of 1836), and continuing on down, under our various constitutions, to the present time. *Pulaski County* v. *Lincoln,* 9 Ark. 320; *Crain* v. *State,* 45 Ark. 450; *State ex rel. Butler* v. *Williams,* 48 Ark. 227; *Hamilton* v. *State,* 62 Ark. 543; *Beard* v. *State,* 79 Ark. 293; *State ex rel.* v. *Stevenson,* 89 Ark. 31-34; *Hill* v. *State,* 100 Ark. 373; *Reece* v. *State,* 118 Ark. 310.

(5) As was held in *Nelson* v. *State,* 102 N. W. (S. D.) 885-886, the distinction between terms fixed by the Legislature and terms ordered by the judges, or what may be designated as regular and special terms, is discernible in the history of our territorial and state legislation. See *Harriman* v. *State,* 2 Green (Iowa) 270-275. Special terms are as much a part of our judicial system, under the Constitution, as are the regular terms. Special terms held at the times and places ordered by the circuit judges, under the above sections, are in strict accord with the requirements of the Constitution, for when held under the above sections they are held at such times and places as were, at the time of the adoption of the Constitution, prescribed by law. There is nothing in the prior constitutions, and there is nothing in the present organic law, that inhibits the Legislature from authorizing circuit judges to prescribe or fix the times and places for holding special terms of circuit courts, and when these times and places are fixed by the circuit judges in the manner provided by the statute such times and places are as much prescribed by law as if the Legislature itself had so fixed the time.

At the time the framers of our present Constitution convened they were familiar, of course, with the existing statutes and decisions. Special terms had then become so firmly implanted in our law that if the framers of the Constitution had intended to uproot them it is but reasonable to conclude that they would have done so in express terms. But, instead, they used language broad enough to include special terms which contains no in-

hibition upon the Legislature prescribing the times and places for the convening of such terms, and which the Legislature at that time had already done by delegating such authority to the circuit judges.

The order of the circuit judge calling the special term was in correct form and was entered on the record ten days before the special term was to begin, but the clerk of the circuit court had not entered his certificate on record showing the time when the order of the circuit judge had been received in his office and the time when he had entered the same upon the criminal records of the court.

The appellant contends that the circuit judge was without jurisdiction to hold the special term of court because the record itself did not show by the certificate of the clerk indorsed thereon that the order had been entered of record by him ten days before the meeting of the special term.

(6) We have often held that every fact essential to give the court jurisdiction must be made to appear of record. These jurisdictional facts are: *"First,* that some person is confined in jail who may be lawfully tried upon some criminal charge; *second,* that it shall not interfere with any other court to be held by the same judge; *third,* that it shall not be held within twenty days of the regular term of such court; *fourth,* that an order therefor be made out by the judge and by him transmitted to the clerk; and, *fifth,* that the same be entered of record." *Dunn* v. *State, supra; Reece* v. *State, supra.*

(7) It will be observed that the requirement of the statute is, that the clerk "shall enter" the order of the circuit judge calling the special term "on the records of the court." *The statute does not require and this court has never held that the record must contain the certificate of the clerk to the effect that he had entered the order ten days before the meeting of the special term. The essential thing required by the statute is that the order of the circuit judge be entered upon the

---

*Kirby's Digest, § 1532.

record, and if it be held that the entry must be made ten days before the convening of the special term (which we do not find necessary to decide in this case), the statute does not provide that the record itself shall be the only proof of that fact, and there is nothing in the law to prohibit the circuit judge, when he comes to convene the court in special session, from ascertaining the fact, by the testimony of the clerk who made the entry, as to when the same was made, and from having him record his certificate at that time showing that the order had been entered of record ten days before the special session began. *Crane* v. *State, supra,* does not hold that the court would have no jurisdiction unless the record itself, at the time of the convening of the special session, showed that the order had been entered upon the record ten days before the court was to begin. In that case this court declined to review the proceedings of the trial court because at first the record for review did not show that the order of the circuit court was made ten days before the term convened. The Attorney General, however, suggested a diminution of the record and brought before the court further proceedings that were had in that case from which the court was satisfied that the order was made and entered of record according to the time prescribed. The court being thus satisfied, held that the trial court, in special term, had jurisdiction.

(8) Appellant also contends that the order was defective in not specifying that he was charged with the several murders for which he was indicted at the special term. The order reciting that appellant was accused of murder was sufficient to put him on notice of the crime which he was charged to have committed, and of which he was, at the special term, indicted and convicted.

IV. The court permitted the State, over the objection of appellant, to ask the jurors, on their *voir dire,* if they had such scruples against capital punishment as would prevent them from finding the defendant guilty where their verdict would mean his execution. Upon

the jurors answering in the affirmative the court sustained the State's challenges for cause.

(9) Under the law, as we construe it, capital punishment has not been abolished, and it still being within the province of trial juries to return a verdict that would result in capital punishment, the State, in the trial of cases where the death penalty may be imposed, is entitled to a jury that has no conscientious scruples as to such penalty.

V. The court did not err in overruling appellant's plea of former conviction.

(10-11) The conviction of appellant at a former term of the court for the crime of murdering Eard Bearden was a conviction for an entirely separate offense than that of the murder of Abbie Bearden. The proof shows that the killings were not simultaneous; that they were not the result of one shot, but were the result of entirely separate acts. The question as to whether the murder of two persons by the same act would constitute but one offense is not presented. Therefore, a conviction in one of the cases could not be set up in bar of a prosecution for the other. *People* v. *Majors,* 52 Am. Rep. (Cal.) 295; *Gunter* v. *State,* 20 So. (Ala.) 632; *Kelly* v. *State,* 62 S. W. (Texas) 915. Nor would the fact that appellant had been convicted and was then undergoing life imprisonment for the murder of Eard Bearden preclude the execution of the death penalty for the murder of Abbie Bearden. Such construction would enable him to escape the extreme penalty of his crime. The law does not contemplate that a criminal may escape the extreme penalty for his crime because he is undergoing punishment of a less severity upon the conviction of another offense, for otherwise "the fact that the criminal had committed more than one crime would inure to his benefit." *State* v. *Rodgers,* 84 S. E. 304-305.

VI. (12) Homer Bearden, a witness on behalf of the State, testified on direct examination that he knew there was trouble between Eard Bearden and his wife and Sam Bell and also between Bell and Dick Fryer and Roy

Fryer prior to the killing, "but as for Sam Bell's troubles it was only hearsay." To this testimony appellant's counsel did not object when it was offered.

Witness was asked, "What was the character of trouble between your brother and his wife and Sam Bell?" and answered, "Well, it was a pretty serious nature, I should think." Appellant's counsel objected to the statement. Witness was then asked, "State if you know the reason for this trouble, what it grew out of and how it developed and progressed?" Counsel objected to the question and it was not answered.

Witness was further asked as follows: "I will ask you if you ever heard Sam Bell cursing or abusing Mrs. Bearden?" and answered, "I have." Witness then stated, in answer to questions, that this occured in front of his store about a year before the killing, and that "there was some serious feelings between them up before he gave her this cursing, and continued on up until the murder." Counsel for appellant did not object to this testimony.

Counsel for appellant, on cross-examination, asked the witness, among others, this question: "What reason did he assign for his ill will? Did he accuse her of anything?" Witness answered, "Yes." Counsel then asked, "What was he accusing her of?" and he answered, "He had insulted her, so she stated to me in the fall of 1912."

Among other questions asked the witness by appellant's counsel on cross-examination was the following: "Was he accusing Bearden's wife of unchastity, in effect? Do you know that he was doing that?" Witness answered this question, "Well, he never did in my presence; that is based on general rumor." The witness was then asked, "What did he ever say in your presence about her?" and answered, "That was all that was ever said." Witness further stated, in answer to questions of appellant's counsel, "I did not hear Bell speak it, but my brother and his wife both related this to me and my wife."

Many questions of like kind were asked by appellant's counsel which developed the fact that witness testified from statements made to him by his brother and his brother's wife that appellant had been talking about Mrs. Bearden, and, in effect, accusing her of unchastity; that on this account appellant harbored malice and ill will toward them. Witness concluded his testimony on cross-examination by stating, "I didn't know nothing about their troubles only hearsay."

Counsel for appellant, at this juncture, made no objection to the testimony and did not ask the court to exclude the same, but witness was then re-examined by counsel for the State, and testified, in answer to questions, that the character of insult that Bell had offered to Mrs. Bearden, from his information, "was a very indecent one," witness stating that it was "a reproach upon her virtue."

Appellants' counsel did not then object to this testimony or ask to have it excluded, but, on the contrary, re-cross-examined the witness and asked him this question, "Now as to the character of the insult that Bell gave Mrs. Bearden; how did you learn that?" and he answered, "I learned it from the mouth of my sister-in-law." Witness then related, in answer to the question of appellant's counsel, that his first information came through witness' wife, the details of the fact having been related to her, and then stated that all he knew about it was what was told him; that he himself did not hear Bell insult Mrs. Bearden.

Later on in the progress of the trial and towards the conclusion of the testimony, during the cross-examination of one of appellant's expert witnesses, counsel for the State propounded the hypothetical question in which it was assumed that the State had proved that appellant had made an indecent proposal to Mrs. Bearden. Appellant's counsel then moved "to strike out all of the testimony going to show that Homer Bearden stated that Mrs. Abbie Bearden told him that an improper proposition had been made to her by the defendant," and

also to strike out of the State's hypothetical question "that an indecent proposal was made to her at which she took offense and reprimanded him, about which she later told her husband and her brother-in-law and his wife." The court overruled the motion and appellant excepted.

Appellant now contends that the testimony of Homer Bearden was incompetent, and that the court erred in not sustaining his motion to strike it out. In *Warren* v. *State,* 103 Ark. 165-171, we said: "Where incompetent evidence is offered, it is the duty of the party to object immediately, or at least within a reasonable time. If he fails to object at the time and afterwards asks for the exclusion of the incompetent evidence, he cannot demand its exclusion as a matter of right, but the request addresses itself to the discretion of the court. A party can not speculate upon what the testimony of a witness will be and then at the end of the trial demand as a matter of right that the incompetent testimony be excluded. * * * It is within the province of the court at any time to strike out incompetent testimony when requested to do so; but, as it is a matter of discretion with the court whether it will exclude the testimony at a subsequent stage of the trial, an abuse of the discretion must be shown before this court will reverse."

Appellant's counsel not only did not make seasonable objection to the testimony of which they now complain, but, on the contrary, it appears that they themselves elicited it. We cannot say, considering the manner in which this testimony was developed, that the court abused its discretion in overruling appellant's motion.

VII. The testimony on behalf of the State tended to show that on the 26th day of April, 1915, appellant, at about 8 o'clock p. m. killed, in rapid succession, with a repeating shotgun, Eard Bearden, his wife, Abbie Bearden, Dick Fryer, her father, and Amos Fryer, her brother; that several months prior to the killing appellant had insulted Mrs. Abbie Bearden; that he made indecent proposals to her; that he had used an offensive epithet

towards her about which she informed her husband Eard
Bearden; that the latter had appellant arrested for a
breach of peace; that in consequence of such arrest ap-
pellant became deeply incensed and threatened to kill
Mrs. Abbie Bearden if it took him twenty years and if
he had to slip up in the night and shoot her; that he
engaged in a fight with Eard Bearden, cutting him
severely; that soon after this appellant's wife, who was
a sister of Mrs. Abbie Bearden, secured a divorce from
him and went to live with her own people; that appel-
lant claimed that the separation of his wife from him
was caused by Mrs. Abbie Bearden and his wife's peo-
ple and his own people; that appellant believed that
this separation and divorce had damaged his reputation,
and that in consequence of all these things appellant
was mad with Mrs. Bearden and her husband and the
others whom he slew; that his ill will continued on to the
time of the homicides, and that he made threats to kill
them; that he armed himself and sought out the persons
whom he killed and slew them with malice aforethought
and in a spirit of revenge growing out of the previous
trouble which appellant claimed those persons had
caused him.

The appellant did not deny the killing. A plea of
insanity was interposed in his behalf and evidence was
adduced by him tending to show that up to the time of
the trouble with Mrs. Bearden and her husband he had
borne a good reputation in the community where he
lived; that his wife was a young lady of irreproachable
character, to whom he was devotedly attached; that his
love and devotion continued, nothwithstanding the di-
vorce, to the time of the killing; that soon after his mar-
riage, without any apparent reason or just cause, he con-
ceived the idea that his wife's relatives and his own rela-
tives were trying to cause him and his wife to separate;
that it was through their influence that the separation
and divorce were brought about; that when brooding over
his family troubles he would express intense love and
devotion for his wife and on these occasions would break

down and shed tears, stating that he regarded himself as ruined, that his life was worth nothing to him, that he would as soon be dead as alive; that this condition of his mind gradually grew worse; that he lost his appetite, lost flesh, was unable to sleep, would lie in bed and groan and grit his teeth for practically the entire night; that he censured his own sister, who had raised him, accusing her of being a bitter enemy against him in his troubles, saying that he did not have any more use for her than he did for a yellow negro; that before this time he had always spoken of her in terms of the tenderest affection; that he likewise censured his own brother, stating that his brother had accused him of being crazy; also he had censured his uncle, (with both of these before that time he had been on affectionate terms); that he threatened to kill his own people and his wife's people, accusing them all of having turned against him and having ruined his life, saying that they had gotten everybody down on him, and that when he passed his acquaintances he imagined they were saying "there goes that damned crazy son-of-a-bitch;" that notwithstanding his uncle's persistent denials that he had anything against him he continued still to angrily accuse him; that he went to the scene of the killing on horse-back and hitched his horse near by, slipping up to the house of Eard Bearden, killing him, and then killing Mrs. Bearden; that the report brought the elder Fryer to the scene, whom he killed before leaving the house; that on leaving the house he met Paul Gordon, whom he knew; that Paul asked him not to shoot him and he remarked in a low voice that he would not hurt a hair on his head, and immediately after the conversation with Paul Gordon he met Amos Fryer; that when appellant discovered Amos Fryer he started toward him gritting his teeth so that it could be heard a distance of thirty feet; that he then killed Amos Fryer; that after the killing appellant left his horse and started towards Morrilton on foot, a distance of 9 or 10 miles; that on arriving there, although he had lived in Morrilton and was acquainted with the different

locations in the town, and especially the court house, he became confused in his efforts to find the sheriff; that he went to a wagon yard and awakened the keeper and requested him to carry him to the sheriff; that when this party had proceeded with him to within two blocks of the sheriff's house appellant requested him to go back, stating that he had gone far enough; that appellant was directed by this party where he might find the sheriff, but he went several blocks beyond and aroused other parties; that on finally reaching the sheriff he told him of the killing, but expressed no concern about it; that the sheriff, who had known him intimately for many years, could not tell any difference in his appearance at that time than when he was at peace with everybody, except that his clothing was soiled and he laughed a hacking laugh when he detailed the killing; that he had no care for what he had done and expected to be electrocuted and discussed it with the sheriff; that he refused to talk to counsel who had been appointed to defend him on a former trial, refused to give them any assistance, and after having been convicted and given a life sentence expressed regret that he had not been condemned to be electrocuted; that during the progress of the present trial he had given no indications of any concern whatever for what was going on.

Many witnesses who were intimately acquainted with the appellant and who had been closely associated with him, after detailing the facts, gave an account of many strange and unnatural things that appellant did, and gave it as their opinion that at the time of the killing he was insane.

Hypothetical questions were propounded to medical experts who were introduced as witnesses on behalf of the appellant, and after stating the above and many other facts which the testimony on appellant's behalf tended to prove, they were asked to give their opinion as to the sanity or insanity of the appellant at the time of the killing, assuming the statement of facts contained in the hypothetical question to be true, and they gave

it as their opinion that the appellant was insane. Experts also testified that one affected like the appellant seemed to be, judging from the facts stated in the hypothetical question, might know that his acts were a violation of the law but still be unable to make a choice between right and wrong. They also testified that in their opinion a *paranoiac* "may realize at the time the consequences of the act and still be impelled by the delusion to commit it."

One of the experts was asked, "In what way was the manner of the killing indicative of mental derangement?" and answered, "The cool deliberation in which the deed was done; the coolness with which he talked to those during the commission of the act; the correctness with which he aimed that gun and the deadly result, and the coolness with which he departed from the place, and the fact that he did not go back to get his horse, but went directly on and did not seem to pay any attention, and went directly on to carry out the probable conclusion of his plans."

The State, in rebuttal, introduced experts and propounded to them a hypothetical question in which facts were stated which the testimony of witnesses on behalf of the State tended to prove, and the witnesses were asked to give their opinion as to appellant's insanity. They answered as follows: "Assuming that these are the facts, and the true facts, it would not necessarily indicate insanity." It was assumed, among other facts stated in the hypothetical question, that appellant had made "indecent proposals" to Mrs. Abbie Bearden, at which she took offense, and for which she had reprimanded him and reported the same to her husband and to her brother-in-law and his wife.

(13) Counsel for appellant objected to the hypothetical question "on the ground that it assumes many facts that are not in evidence at all, and that it is incompetent on cross-examination." As we have already seen, counsel also moved to strike from the hypothetical question that part of it which assumed that appellant

had made indecent proposals to the deceased. It thus
appears that counsel for appellant objected to the hypo-
thetical question on the ground that it assumed many
facts that were not in evidence. Counsel urge as the
most prejudicial part of it the assumption that appel-
lant had made indecent proposals to the deceased, con-
tending that there was no proof whatever for this as-
sumption. But, as we have shown, the court did not
abuse its discretion in overruling appellant's motion to
strike from the hypothetical question the statement that
appellant "had made indecent proposals to Mrs. Abbie
Bearden," because counsel for appellant themselves had
elicited this testimony and had not made their motion
to strike it out in apt time.

(14) The other ground of objection to the hypothet-
ical question is not well taken for the reason that from the
viewpoint of the State there was testimony tending to
prove substantially all the facts therein stated. In view
of a new trial, however, it is proper to say that if coun-
sel for appellant had objected to the question on the
ground that they now urge here for the first time, to-
wit, that it omits undisputed facts shown by the evidence,
the court should have sustained the objection and should
have required that it be reformed so as to include essen-
tial and material facts established by the undisputed
evidence of witnesses that were introduced on behalf of
the appellant. It appears that the experts in answering
this question based their opinion upon the assumption
that the facts stated therein were true, and that it con-
tained all the undisputed facts with reference to the con-
duct of appellant as tending to show his sanity or in-
sanity. A reference to the statement of facts which the
testimony on behalf of the appellant developed will dis-
cover that a great many undisputed facts with refer-
ence to appellant's strange and unnatural conduct from
the time that his domestic troubles began, down to the
time of the killing, and immediately thereafter, were en-
tirely omitted from the hypothetical question.

(15) The testimony of experts to the effect that appellant was sane at the time he did the shooting was very material. This testimony was based upon the State's hypothetical question. As before stated, if objection had been made to it on the ground that it did not include many material undisputed facts the court should have sustained the objection. To have ruled otherwise would have been error highly prejudicial to the appellant. See *Taylor* v. *McClintock,* 87 Ark. 243-293; *Ford v. Ford,* 100 Ark. 518; *Williams* v. *Fulkes,* 103 Ark. 196. But as there was no specific objection to the hypothetical question on the ground that it omitted facts shown by the undisputed evidence the court did not err in permitting the question in the form propounded. It was held in *Powell* v. *State,* 74 Ark. 355, that an objection, to be effective, must be specific so as to apprise the trial court of the particular error complained of by the objection. See also *Clardy* v. *State,* 96 Ark. 52-57. In *Harding* v. *State,* 94 Ark. 65, we said: "As to the admission of evidence in a trial, the question as to its admissibility or competency must be presented to the circuit court by objection before it can err as to its admission."

(16) VIII. The record shows that the specially employed counsel representing the State, and the prosecuting attorney, "argued and stated to the jury that the defendant had made indecent proposals to the deceased Abbie Bearden, and argued at length and denounced and criticised the defendant for making the indecent proposals."

Inasmuch as the court did not err in overruling appellant's motion to strike out the testimony of Homer Bearden, to the effect that appellant had made indecent proposals to deceased Abbie Bearden, it follows that there was no error in permitting the counsel for the State and the prosecuting attorney to comment upon such testimony. It was in the record as testimony. While the record states that the attorneys "criticised and denounced" appellant, the specific language in which the alleged criticisms and denunciations were couched is not

set forth. Therefore we can not say that there was any improper criticism or denunciation.

(17)  IX. The law on the issue of insanity may be briefly stated as follows: The law presumes that every man is sane and that he intends the natural consequences of his act. Therefore, where one is charged with murder in the first degree, and it is admitted that if sane he is guilty as charged, and the plea of insanity is interposed as his defense, in such cases the burden is upon the accused to establish his insanity by a preponderance of the evidence. *McKenzie* v. *State,* 26 Ark. 334; *Casat* v. *State,* 40 Ark. 511-522; *Coates* v. *State,* 50 Ark. 330-333; *Williams* v. *State,* 50 Ark. 511-519; *Bolling* v. *State,* 54 Ark. 588-602.

(18)  Where one is on trial for murder in the first degree and the State proves the killing under circumstances that would constitute murder in the first degree if the homicide was committed by a sane person, then if the killing is admitted and insanity is interposed as a defense such defense can not avail unless it appears from a preponderance of the evidence, *first,* that at the time of the killing the defendant was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing; or, *second,* if he did know it, that he did not know that he was doing what was wrong; or, *third,* if he knew the nature and quality of the act, and knew that it was wrong, that he was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done, and unable, because of the disease, to resist the doing of the wrong act which was the result solely of his mental disease.

(19)  The first and second of the above tests were approved by this court in *Casat* v. *State, supra,* and *Bolling* v. *State, supra, Williams* v. *State, supra,* and the last test was approved in *Green* v. *State,* 64 Ark. 523-534, *Williams* v. *State, supra, Metropolitan Life Insurance Co.* v. *Shane,* 98 Ark. 132. These tests are in accord with the great weight of modern authority. See *Parsons*

v. *State,* 81 Ala. 577, and cases there cited; *Davis* v. *United States,* 165 U. S. 373-78; *Lowe* v. *State,* 96 N. W. 417-424; *Doherty* v. *State,* 50 Atl. 1113; *State* v. *Kelley,* (Vermont) 52 Atl. 434-436; *Jolly* v. *Commonwealth,* 96 Am. St. Rep. 429, 110 Ky. 190; *Abbott* v. *Commonwealth,* 107 Ky. 624; 12 Cyc. 169, e note, 21 Cyc. 663 *et seq.,* 665, b note. In *Bolling* v. *State, supra,* this court, while approving the rule as stated in McNaughten's case, did not hold that the tests there announced were the only tests. The first of the tests is applicable in every case where the evidence tends to show general insanity or dementia. The second and third of these tests are applicable in every case where the evidence tends to prove, as it does here, that the accused, at the time of the alleged criminal act, was afflicted with that disease of the mind termed by medical experts, alienists and authors on medical jurisprudence as *paranoia,* which has progressed to the "stage of persecution." This disease manifests itself and is characterized by systematized delusions; that is, a delusion based on false premises, pursued by a logical process of reasoning to an insane conclusion. *Taylor* v. *McClintock, supra.* The victim of this disease, in its first stage, has apparently a sound mind upon all subjects except those coming within the particular sphere of his delusion, and he may then be able to control his actions with reference to his delusion. Hence the reason for the rule announced in *McNaughten's case,* 10 Clark & Finley Rep. 199-211, and recognized by us in *Bolling* v. *State, supra,* that where one labors under a partial delusion only, and is not in other respects insane, he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. But where the disease has progressed to its second stage, according to Wharton and Stilles, in their excellent work on Medical jurisprudence, pp. 828, 1031 b., "the patient passes on to the formation of delusions of suspicion and persecution. He believes he is the object of evil designs of others; he is talked about and maligned; he is shunned; his plans are thwarted; he is un-

justly dealt with; he is defrauded of his rights; ∗ ∗ ∗ He may fasten his suspicion upon some particular person or persons. He meditates plans of protection, and then of resentment. He has now become the persecuted paranoiac, the most dangerous of all the insane.''

In this the second stage of the disease the mind of the victim of paranoia may have become so completely dominated by the disease as to render him incapable of controlling his actions with reference to the subject-matter of his delusions. The disease may have progressed to the extent that, in the language of Dean on Med. Jur. 497, ''the reason has lost its empire over the passions and the actions by which they are manifested to such a degree that the individual can neither repress the former nor abstain from the latter.'' But he adds, ''It does not follow that he may not be in possession of his senses. The maniac may judge correctly of his actions without being in a condition to repress his passions and to abstain from the acts of violence to which they impel him.'' Hence, the reason for the third test mentioned above, approved by the best of modern authorities. See *supra.*

(20) But it must be remembered that one who is otherwise sane will not be excused from a crime he has committed while his reason is temporarily dethroned not by disease, but by anger, jealously or other passion; nor will he be excused because he has become so morally depraved ''that his conscience ceases to control or influence his actions.'' In other words, neither so called ''emotional'' nor ''moral'' insanity will justify or excuse a crime. *Bolling* v. *State, supra.* It was the province of the court to make concrete application of these tests or rules to the facts adduced in evidence, and, guided by them, it was the province of the jury to determine whether or not the appellant was responsible for the crime charged.

The court on motion of the State granted 37 separate instructions, 12 of these on the subject of insanity. The appellant presented 10 prayers on the same subject, 5 of which the court granted. The only objections

urged here are the rulings of the court in its instructions on the issue of insanity. It is not surprising that in the multiplicity of prayers for instructions on this issue, many of them conflicting, long, and involved, that the trial court, being under the necessity of ruling promptly and not having the time to investigate, should have failed to give a consistent and harmonious charge in conformity with the law as above announced, which we find to be the case. We cannot comment upon each assignment of error and upon the separate prayers in which error appears without unnecessarily extending this opinion, but we shall discuss some of the errors in the prayers for which the judgment must be reversed, and it is believed that what we shall say concerning these, in connection with the above tests, will enable the lower court on another trial to eliminate the errors and frame its charge in conformity with the law as herein stated. Instead of the numerous instructions that were given, it would have been far better if the court, after announcing the law as to the burden of proof and declaring the above tests, had instructed the jury that if they believed from the preponderance of the evidence that the appellant was insane they should acquit him, otherwise they should convict him of the crime charged. If counsel had succinctly presented their respective contentions in a few plain prayers embodying the above tests, doubtless the errors that crept into the court's charge would have been avoided.

(21) In Instruction No. 21 for the State, the jury were told, in the first part of the instruction, that if the defendant, at the time of the killing "was in such an insane condition of mind that he did not know he was doing wrong and did not comprehend the nature and character of the act, then such shooting was not in law or in fact malicious or felonious and you ought to acquit him on the grounds of insanity and return him not guilty." Here the court was undertaking to state the tests under which the jury should determine the guilt or innocence of the defendant on the issue of insanity, and,

as will be seen, the instruction omitted the third test and stated the first two conjunctively instead of disjunctively. In other words, under the instruction the jury could not have acquitted defendant unless they found both "that he did not know he was doing wrong and did not comprehend the nature and character of the act." Whereas he should have been acquitted if at the time of the killing he did not know that he was doing wrong, or did not comprehend the nature and character of the act; or if he knew what he was doing and knew that it was wrong, that his free agency had been so completely destroyed by the disease as to render him unable to choose between the right and the wrong as to the particular act and unable to avoid the deed which was the sole result of his mental disease. The latter part of the instruction tells the jury "if you find from the evidence in this case that the defendant knew at the time that he committed the homicide that it was in violation of the laws of God and society, and realized its consequences; yet if you should further find that the defendant by reason of a perverted and deranged mental condition, either partial or general, was incapable of deliberating or premeditating as to the commission of this particular act, you in that event may find him guilty of murder in the second degree and so say by your verdict, or acquit him outright, accordingly as you may find from the evidence." If the defendant at the time of the homicide, by reason of a perverted and deranged mental condition, either partial or general, caused by a disease of the mind, was incapable of deliberating or premeditating as to the commission of this particular act, then he was not guilty of murder in any degree and should have been acquitted outright.

Now, if the defendant was sane, it was manifest from the enormity of the crime and the shocking manner of its perpetration, that he was guilty of murder in the first degree. The jury were told in this declaration of law that a perverted and deranged mental condition, either partial or general, which rendered the

defendant incapable of deliberating or premeditating as to the commission of the particular act might not excuse him, but that the jury might find him guilty of murder in the second degree. The jury could have concluded that if his perverted and deranged mental condition would not excuse him for murder in the second degree, it ought not to relieve him from responsibility for the higher and only offense of which he could have been convicted under the evidence and the other instructions of the court. This part of the instruction was misleading, contradictory in itself, and in conflict with other instructions and highly prejudicial to the defendant. This part of the instruction, if it means anything, was doubtless an attempt to state the principle announced in the third test; but if so, it was an incorrect statement of it and well calculated to confuse the jury. Under the evidence it had no place in the case.

Instruction No. 20 for the State told the jury in part that "if they believed from the evidence that at the time the defendant did the killing charged in the indictment he was so perverted and deranged in one or more of his mental faculties as to be incapable of understanding at the moment he killed the deceased that such killing was wrong, and that he at the time was incapable of understanding that the act of killing was a violation of the laws of God and of the State, and that if they found he was so insane they should find him not guilty." The above instruction was erroneous because it omitted the first and third tests. It is well to state also in this connection that learned counsel for appellant contend that many of the instructions given at the instance of the State were defective because they did not tell the jury that the defendant should be acquitted if the preponderance of the evidence showed that at the time of the killing he did not know that the act of killing was a violation of the law or did not know the consequences of his act; that this should be stated also as one of the tests of insanity.

It is said in McNaughten's case, above, that "if the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it without proof that he does know it. If the accused was conscious that the act was one which he ought not to do, and if that act was at the time contrary to the laws of the land, he is punishable, and the usual course therefore has been to leave the question to the jury whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong."

(22) Counsel therefore are mistaken in their contention that mental incapacity to know that one's acts are in violation of the law shall also be included in the alternative as one of the tests of insanity. It is true that this is frequently loosely stated in the conjunctive with the right and wrong test, but it is not recognized separately as one of the tests of insanity.

(23) Instruction No. 18 for the State is a follows: "You are further instructed that if the killing had been proven by the State it devolves upon the defendant to prove, by testimony fairly preponderating, that he was in such condition at the precise time the deed was done as not to know the consequence of his act and not to know right from wrong, unless the testimony on the part of the State shows that he was in such condition." This is a literal copy of an instruction that was approved in *Casat* v. *State,* above, as a correct statement of the law as to the burden of proof. The opinion shows that the court was only considering it in that connection, and did not intend to approve it as a correct declaration of law as to the tests of insanity, for as a statement of the tests of insanity it is obviously erroneous, and an instruction of the same purport was condemned in the later case of *Bolling* v. *State, supra.*

In the Bolling case the instruction is as follows: "Insanity will only excuse the commission of a criminal act when it is made to appear affirmatively by evidence fairly preponderating that the person committing it was at the time insane to such an extent as not to know right from wrong." In holding that the instruction was reversible error, Judge Hemingway, speaking for the court, said: "By this test, if the defendant knew or could distinguish right from wrong in the general affairs of life he would be guilty, although upon the one matter pertinent to the case his knowledge and power of distinguishing right from wrong were wholly deficient. It can make no difference that the other instruction correctly stated the rule, for the two are contradictory and irreconcilable and we have no means of determining which the jury accepted as its guide." So we say here.

(24) The instruction was also erroneous because it omitted the first and third tests. Neither in this nor in any other of the instructions given on behalf of the State was the third test accurately stated. In some of them, however, the test, although not correctly stated, was stated in a manner more favorable to appellant than he was entitled to, and of this, of course, he could not complain. Even though all of the tests may have been correctly stated in some of the instructions given at the instance of the appellant, this would not cure the error of omitting them in instructions for the State declaring what was necesasry to be proved by the appellant before his defense of insanity could avail him. The charge as a whole was conflicting and confusing.

X. (25) The prosecuting attorney in the closing argument told the jury that if defendant's relatives, or his wife's relatives, had tried to separate him from his wife, or tried to prevent her return to him, his beliefs were true and not delusions; and if they had tried to separate them or prevent his wife's return, there could not be an acquittal on the grounds of insanity. While the prosecuting attorney was making this argument, appellant's counsel asked the court to instruct the jury

as follows: 14th. "Although you may believe that defendant's or his wife's relatives had tried to separate him from his wife, or to prevent her returning to him, yet if you further believe that he from brooding over such fact became insane, or partially so, to such an extent as to be possessed of an insane delusion as to the fixed and immovable ill will and persecution of his and his wife's relatives, and from such delusion his mind became so diseased that at the time he committed the act he did not know he was doing wrong or did not know that he was violating the law; or you find that he did know that the act was wrong and violated the law, if from his diseased mind he was unable to control his actions and committed the act because of such inability, you should acquit him on account of insanity."

The court did not err in refusing the 14th instruction, because it included as one of the tests that if the appellant did not know that he was violating the law he should be acquitted. As already shown, this is not one of the tests.

It is but proper to say, however, in view of a new trial, that the argument was highly improper, and if seasonable objection had been made to it the court should have sustained the objection, and would have erred to the prejudice of appellant had it not done so. There was no testimony in the record tending to show that either appellant's relatives or his wife's relatives had tried to separate him from his wife or to prevent her returning to him. True, there is abundant testimony to the effect that appellant stated that his own relatives and his wife's relatives had turned against him and had sought to ruin him, and there was sufficient testimony to warrant the inference that appellant believed that they had sought to bring about the separation from his wife and to prevent her return. But we find nothing in the record of anything that was said or done by appellant's relatives or his wife's relatives tending to show that they had brought about or encouraged the separation of appellant and his wife or that they had pre-

vented her from returning to him. So far as the proof shows, this was but a conception in the brain of appellant, with no foundation in fact to rest upon; and it is this fact that furnishes the basis, and the only basis, for the contention of appellant's counsel that the killing was the result of an insane delusion.

Other errors complained of, such as objections to the special venire of the petit jury and improper remarks of counsel in the presence of the petit jury before they were empaneled, will not arise on another trial, and hence we do not discuss them.

If appellant was sane, he has committed one of the most atrocious crimes in all the annals of criminal jurisprudence, and justly deserves the severest penalty of the law; but, on the other hand, if he was insane under any of the above tests, he was not responsible for his deed, however horrible it may be. This is an issue that must be finally settled by a jury under instructions free from prejudicial error. It has not yet been thus determined. Hence appellant has not had that impartial trial guaranteed to him by the Constitution and laws of our State. Art. II, Sections 2, 7, 8, 10, of the Constitution. Sections 1550 and 1552 of Kirby's Digest.

For the errors in the instructions of the court, the judgment is reversed and the cause remanded for a new trial.