HANKINS v. STATE.

Opinion delivered December 22, 1917.

1. HOMICIDE—DEFENSE OF INSANITY—RULE.—In a prosecution for homicide, to establish a defense on the ground of insanity it must be proved by a preponderance of the evidence that at the time of committing the act the accused was under such defect of reason, from disease of the mind, as not to know the nature and quality of the act that he was doing, or, if he did know it, that he did not know that he was doing wrong. If the defendant labors under a partial delusion only, and is in other respects sane, he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were true.

2. HOMICIDE—DEFENSE OF INSANITY—IRRESISTIBLE IMPULSE.—When a homicide is committed through an irresistible impulse which is the

result solely of the disease of the brain, the person committing the homicide under such duress of mental disease, is excused.

3. CRIMINAL LAW—MENTAL CAPACITY—THEORY OF PUNISHMENT.— When one who has the mental capacity to know the nature and quality of the act that he is doing, and that the act is wrong, and who has the power of choice and action, violates these laws, such an one is punished as an act of retributive justice, in order that the interest of society may be protected, and government maintained.

4. HOMICIDE—DEFENSE OF INSANITY—ISSUES OF LAW AND FACT.—In a prosecution for homicide, where the defense of insanity is interposed, the real issue in the case is a mixed one of law and fact; it is an issue of fact for the jury to determine whether the accused at the time of the alleged act was afflicted with a mental disease, and an issue of law as to whether the mental disease is such as will render him irresponsible. The issue of responsibility or irresponsibility, in such cases should be submitted to the jury under proper instructions.

5. HOMICIDE—DEFENSE OF INSANITY—IRRESISTIBLE IMPULSE.—In a prosecution for homicide the court gave the following instruction: "The court instructs the jury that even though you should believe from the evidence that the defendant was suffering from a delusion that his wife was too friendly with other men, and that defendant acted upon this delusion when he fired the fatal shot, yet this delusion would not justify the defendant in taking the life of his wife, nor excuse him from criminal responsibility." *Held*, it was error for the trial court to refuse to modify the instruction by the addition of the following, as requested by the defendant: "Unless you further find from a preponderance of the evidence that the defendant at the time of the act was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know that he was doing what was wrong; or if he knew the nature and quality of the act and knew that it was wrong, that he was under such duress of mental disease as to be unable because of the disease to resist the doing of the wrong act, which was the result solely of his mental disease."

6. EVIDENCE—HOMICIDE—DEFENSE OF INSANITY—TESTIMONY OF NON-EXPERT WITNESSES.—In a prosecution for homicide it is improper to permit non-expert witnesses to testify as to the sanity of the accused, without stating any facts upon which they based their opinion, and without showing that they were qualified to express such an opinion by stating the facts upon which such opinion was based.

Appeal from Drew Circuit Court; *Turner Butler*, Judge; reversed.

*Henry & Harris*, for appellant.

1. The record fails to show that defendant was present at each substantive step of the trial. 110 Ark. 523.

2. It was error to limit the time of the argument. 58 Ark. 367; 2 R. C. L. 407-8.

3. Incompetent testimony was admitted. Heflin, Dildoy and King, without having qualified as experts, or showing such an intimate acquaintance, etc., as to qualify them to testify as nonexperts, were allowed to testify. This was incompetent. 120 Ark. 311; 106 *Id.* 362. Direct and leading questions were asked. 114 Ark. 412.

4. There was error in the instructions. 120 Ark. 554; 114 *Id.* 412.

5. Defendant was insane when tried. Kirby & Castle's Digest, § 2447.

6. The verdict was contrary to the evidence.

*John D. Arbuckle,* Attorney General, and *T. W. Campbell,* Assistant, for appellee.

1. The record shows that defendant was present at every substantive step taken. 110 Ark. 523; or waived, 108 *Id.* 191; *Scruggs* v. *State,* ms.

2. Limiting the time of argument is within the sound discretion of the court; no abuse is shown or undue limit. 38 Ark. 304; 100 Ala. 26; 14 Neb. 572; 90 Ill. 117; 149 Ky. 495; 21 Mo. 257; 70 N. C. 241; 55 Wash. 675. See also 88 Neb. 464; 60 Tex. Cr. 236; 148 Ky. 80; *Ib.* 199; 42 Wash. 540; 110 Ala. 11; 112 *Id.* 1; 70 N. C. 241; 136 Mo. 74; 122 Mich. 284.

3. Proper foundation was laid for the admission of expert testimony. 120 Ark. 311. But defendant "camouflaged" his objections and specifically objects here for the first time. 116 Ark. 307; 58 *Id.* 353; 60 *Id.* 550.

4. There is no error in the instructions. They state the law. 54 Ark. 588; 120 *Id.* 530; 95 *Id.* 48; 103 *Id.* 21; 105 *Id.* 467; 114 *Id.* 412. See also 194 S. W. 865.

5. Defendant was not insane when tried. No suspension of the trial was asked. 79 Ark. 293; 94 Id. 65. Nor petition for inquiry as to his sanity, etc. 110 Id. 523.

6. The evidence is ample. 104 Ark. 162; 101 Id. 51. The burden to show insanity was on defendant. He failed to convince the jury.

WOOD, J. A little before midnight on Wednesday, August 15th, 1917, Clarence Hankins shot and killed his wife, Willie Bob Hankins, who, at the time, was staying at the home of her mother, Mrs. Symantha Simmons, in the town of Monticello, Drew County, Arkansas. He was indicted for the crime of murder in the first degree, was tried, convicted and sentenced to imprisonment for life in the State penitentiary, and he appeals to this court.

The killing was admitted, and appellant set up the defense of insanity. The testimony adduced on behalf of the State tended to show that about a month prior to the killing, appellant and his wife "had not been getting along well." She had gone to the home of her mother because of his mistreatment of her. On Tuesday night before the killing he went to the home of his mother-in-law, so she testifies, and "seemed as kind and friendly as he had been at any time." He had two small children. His wife and children went to bed about 7:30 p. m. Clarence went out on the gallery and sat awhile, then went in and played on the organ awhile, then went out on the gallery and smoked a cigarette, then went and got some water, then went back on the gallery and sat awhile. Then he went into his wife's room, waked her up and began to fuss with her. He then went out in the yard. His wife said that he was going home to stay, but directly he came back and asked for his shoes. His wife said: "Clarence, I ought to take a chair and knock you over the head." He replied, "Willie Bob, if you put as much as the weight of your hand on me I will kill you." The next night he came back and entered the house through the back way; asked Mrs. Simmons how much he owed her for board and told her he was going away. When

she informed him how much he owed her he made no reply, but went across the hall into the room where his wife and babies were sleeping. His wife got up and went into the hall. He told her he was going away. When they got on the gallery she said, "Clarence, why did you go off and talk about me?" He said, "Willie Bob, I did not do it." She said, "You did talk about me to two or three." He said, "It's a lie, I did not talk about you." In just a little while a pistol shot was heard and she said, "Oh, Clarence has killed me." He then ran off. Mrs. Simmons stated she saw no cause for his leaving her house on Tuesday night. He came out on the porch as usual and talked with her the same as he always had.

Two or three witnesses testified that on Wednesday night a short time before the killing, appellant was trying to borrow a gun and stated that he was going to a certain place and didn't know but that he would have trouble, that he was going to leave for a little while and it might blow over. One of them let appellant have his pistol. Another testified that he had a conversation with appellant Wednesday morning. Appellant said that on Monday night after he and his wife had been in bed awhile his wife got up and went out, and a little while afterwards, he got up and went out. He found his wife out there about the lot and there was a man out there, who came across the branch towards the barn. Clarence said he ought to shoot him but thought it was best to go away. This witness testified, on cross-examination, that he had known the appellant for eight years and had been working with him for four or five years; that within the last month before the killing he had noticed a change in appellant's disposition, his appearance, and actions." He was inattentive and seemed like something was bearing on his mind."

Appellant told another witness on Wednesday, before the killing that night, about separating from his wife the night before, and said he was going to leave and talked as though he wanted to injure her some way. The witness saw appellant in jail the next day, and

appellant then said to witness that he was sorry for what he had done and wished he had done what witness had advised him to do, saying that if he had he would not have been in the trouble he was then in. He remarked that "they were liable to break his neck, but that death was short that way and would be that quick," snapping his finger. In the conversation, he said that he was leaving his wife on account of someone being there. The witness who had this conversation was a brother-in-law to appellant, and stated that the talk about his wife had been worrying appellant a whole lot.

On behalf of the appellant the testimony tended to show that his reputation for peace and quiet was good. One witness, who had known appellant all his life, stated that about thirteen years before appellant stayed at her house about three or four months, during which time he was struck by lightning, which rendered him unconscious eight or ten minutes. After that he could not work in the sun at all, and did not seem like the same boy.

Another witness, a sister-in-law, had known him about three years, and had lived in the same house with him for nearly a year, and had worked in the mill with him. She stated that she noticed a difference in the way he worked after his first separation from his wife, which occurred about three or four weeks before the killing. After the separation he would often quit his work for hours and just stare around the shop. She thought he was insane.

Several witnesses who had known him intimately and had had an opportunity to observe him closely testified that after his first separation from his wife he seemed very nervous and absent-minded, neglected his work, and tried to avoid people. He could not remember anything, and made a good many mistakes in his work.

It was shown that there was considerable talk around the mill about his wife and another man. His sister testified that he worried a great deal about his trouble, and got to where he could not attend to his work. "He would

not notice us. He was like he was in a dream or something.''

Another witness, who had known him for twelve years, and had worked with him pretty nearly all that time at the mill, stated that he noticed a great change in the appearance of appellant before the killing. ''He seemed to be in powerful low spirts.'' Monday night preceding the killing, witness met the appellant and he did not notice witness nor speak to him. He did not seem to realize who witness was or that he was any one at all. This caused witness to say to himself, ''Old boy, you're all in; just about ready for the asylum.''

Appellant's brother-in-law, who had grown up with him, testified that from the time of the first separation it seemed that appellant's head ''was giving way on him right along, and he did not seem in a normal state of mind at all.'' He came to witness' house three or four hours after the homicide and was in an awful fix. He said, ''Don't let no bunch get hold of me.'' He was muddy up to his knees and did not have on any hat. They·carried him to town and turned him over to the jailer, and when he was searched a small vial of chloroform was found in his pocket.

Another sister testified that the morning before the killing he came to her house and acted very peculiarly; did not speak a word, but went through all the drawers of her bureau, which caused her to remark to her husband that she ''believed he was going crazy.'' She ''firmly believed that he was losing his mind.''

One of the witnesses testified that he had known the appellant ten or fifteen years; that the morning before the killing the appellant came to witness' store and told him he was going to Hampton to deliver some goods and collect for some goods for an installment house. Witness said something to appellant about working at the mill. Appellant said he had not worked there for two months. He told witness how he ran the installment business. There was no reason for him to tell this to witness if he was not working for an installment house.

Another witness stated that some time before the killing "he would work on a loom half a day; did not know what he was doing, seemed addled."

The mother of appellant testified that when he was about four years old he had choking sensations, and that he was never normal in his life; that after he was struck by lightning he never could work in the sun any more and had bad spells of nervous prostration. He and his wife got along well after they were married until the separation. "He loved his wife too much and finally went crazy about it." There was a great deal of insanity in the family of witness. Nine members of the family were crazy. The night before the killing appellant came to witness' house nearly wild. He said, "My God, she is guilty, so help me God." She tried to put him to sleep, but he would not go to bed. She put her arms about him and tried to hold him down on the sofa, but he would lie a while' and start to get up. At length witness dropped off to sleep, and when she awoke appellant was gone and the door was wide open.

The jailer testified that when appellant was received at the jail he seemed as a child and had to be dealt with as such. He fell asleep and slept all that day and all that night and part of the next day, did not wake up even when it was raining. Since that time his physical and mental condition had improved and the jailer did not consider him to be an insane man.

Dr. Stanley M. Gates had been treating the appellant about five months before he killed his wife. Appellant thought he had lung trouble. Appellant was mistaken about this. The doctor circumcised him and he did not even flinch while the operation was going on. Appellant said that life was a hell to him and that he did not care for anything. He was in a very bad condition physically and was very nervous. The doctor visited him after he was put in jail. He was also very nervous then. He would talk disconnectedly and his jaws worked peculiarly. The doctor, after qualifying as an alienist, testified that in his opinion the appellant was suffering from paranoia

and stated the symptoms (which he described) indicated that he was so afflicted. He gave it as his opinion that the appellant at times did not know the difference between right and wrong, and did not realize the consequences of his act when he shot and killed his wife. It was the opinion of the expert that appellant felt justified in doing the act, and in his opinion appellant was still insane.

Three witnesses who were not experts and who had had no intimate acquaintance or association with appellant were permitted to state, over the objection of appellant, that they were with him or saw him at a show on the night of the killing and there was nothing in his conduct to indicate that he was insane. This testimony was elicited in response to a leading question as to whether there was anything in his conduct or appearance that indicated that he was insane.

The court gave correct instructions on the law of murder as applied to the facts from the State's viewpoint of the evidence. The court, in several of its instructions, also declared the law applicable to the defense of insanity as disclosed by the testimony adduced by the appellant. Among other instructions the court gave the following:

"24. The court instructs the jury that even though you should believe from the evidence that the defendant was suffering from a delusion that his wife was too friendly with other men, and that defendant acted upon this delusion when he fired the fatal shot, yet this delusion would not justify the defendant in taking the life of his wife, nor excuse him from criminal responsibility."

The appellant objected specifically to the giving of the above instruction, and requested the court to modify the same by adding the following: "Unless you further find from a preponderance of the evidence that the defendant at the time of the act was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong; or if

he knew the nature and quality of the act and knew that it was wrong, that he was under such duress of mental disease as to be unable because of the disease to resist the doing of the wrong act, which was the result solely of his mental disease.''

The facts of this record present a proper case for the application of the law of insanity as announced by this court in the recent case of *Bell* v. *State,* 120 Ark. 535, 553-555. In that case we reviewed the previous decisions of our own court and the authorities generally upon the subject, and endeavored to announce succinctly and clearly the legal rules or tests that should be applied, according to the facts in any case, by which the jury should be guided in considering the evidence in order to determine whether the accused is responsible for the crime charged where his only defense is that of insanity.

(1-2)  In *Bolling* v. *State,* 54 Ark. 588, 601-2-3, we approved the rules in *McNaghten's Case* (10 Clark & F. Reps. 199), towit: ''That to establish a defense on the ground of insanity it must be proved by a preponderance of the evidence that at the time of committing the act the accused was under such defect of reason, from disease of the mind, as not to know the nature and quality of the act that he was doing, or, if he did know it, that he did not know that he was doing wrong.'' And the further rule, towit: ''That if the defendant labors under a partial delusion only, and is in other respects sane, he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were true.''

In approving these rules of *McNaghten's case,* the court did not hold that the doctrine of irresistible impulse caused by disease of the mind would not be a good defense in cases where the evidence adduced warranted it.

In *Bolling* v. *State, supra,* the court was of the opinion that the evidence did not warrant an instruction on irresistible impulse, and gave this as one of the reasons why the ruling of the trial court was correct in refusing prayers for instructions on that subject, and as a further

reason, this court held that the offered prayers on that subject made no distinction between the irresistible impulse arising out of mere passion or revenge and impulse when the product of a diseased mind.

Now, it seems to us, *en passant*, that this court, in *Bolling* v. *State, supra,* did not have the correct view of the evidence on the issue of irresistible impulse, for the testimony tended to prove that Bolling was afflicted with paranoia or delusional insanity which had progressed to the stage of suspicion and persecution, in which stage the homicidal tendency or mania is most pronounced. Wharton & Stille's, page 828, section 1031-b, page 1035. But be this as it may, the point we wish to stress here is that the comments of this court in passing upon the prayers for instructions in *Bolling* v. *State* show that the court had in mind and did not intend to ignore the doctrine that irresistible impulse is a defense to a charge of murder when such impulse is the product of a diseased mind.

That this court in that case did not intend to ignore or overrule the doctrine of irresistible impulse is further shown by the fact that this court, in *Williams* v. *State,* 50 Ark. 511, had held that where one "in consequence of insanity is rendered unable to control his actions by the great excitement or distress which prayed upon his mind at the time the act charged was done" he is not responsible for such act. Judges COCKRILL and BATTLE made the opinion in *Williams* v. *State, supra,* which was about two years before the decision in *Bolling* v. *State, supra.* The same great judges took part in the latter decision, and we may be sure that if the court had intended by approving the rules in *McNaghten's Case* to ignore or to announce any doctrine contrary to the doctrine in *Williams* v. *State, supra,* Judge HEMINGWAY, who voiced the opinion of the court in *Bolling* v. *State, supra,* would have so stated in express terms.

We have reached the conclusion therefore that this court, by approving the rules substantially of *McNaghten's Case* in *Bolling* v. *State, supra,* did not intend to enunciate any rule that was in conflict with the doctrine

that when a homicide is committed through an irresistible impulse which is the result solely of the disease of the brain, that the person committing the homicide under such duress of mental disease is excused. In coming to this conclusion, we are not unmindful of the fact that the rules of *McNaghten's Case* have been severely criticised as being unsound generally and in conflict with the above doctrine. Inasmuch as we approved these rules in *Bolling* v. *State, supra,* without comment, it may be well to note here and briefly review the criticisms made upon these rules and then give our reasons for approving the rules.

The Supreme Court of New Hampshire wholly repudiates the *McNaghten* rules. Indeed, that court goes to the extreme view of holding that no legal rules or tests should be declared by the court as a guide to the jury in determining whether or not the defense of insanity, in any given case, should avail the accused. The doctrine of the New Hampshire cases is that insanity is a disease of the mind, that an act which results from a disease of the mind is not criminal; that whether or not a person accused of crime is afflicted with a mental disease, and whether or not the crime was the result of such disease, and whether the will of the accused, by reason of a disease of the mind, was overcome by an impulse which he could not resist, are all questions of fact; that the entire question of responsibility where the defense is insanity is one of fact to be submitted to the jury; that the jury should be told that the only issue for it to determine is, whether the killing was the offspring or product of mental disease, and that their verdict should be guilty or not guilty, according as they find that fact to be. *State* v. *Jones,* 50 N. H. 369, 398-399; *State* v. *Pike,* 49 N. H. 399, 442.

In the latter case the court concludes its discussion of the *McNaghten* rules, and the decisions of the courts approving them, as follows:

''The whole difficulty is that courts have undertaken to declare that to be law which is a matter of fact. The principles of the law were maintained at the trial of the

present case, when, experts having testified as usual that neither knowledge nor delusion is the test, the court instructed the jury that all tests of mental disease are purely matters of fact, and that if the homicide was the offspring or product of mental disease in the defendant he was not guilty by reason of insanity."

In *Parsons* v. *State,* 81 Ala. 577, 595, the court says: "The rule in the *McNaghten Case,* as decided by the English judges and supposed to have been adopted by the court, is that the defense of insane delusion can be allowed to prevail in a criminal case only when the imaginary state of facts would, if real, justify or excuse the act. It holds a partially insane person as responsible as if he were entirely sane, and it ignores the possibility of crime being committed under the duress of an insane delusion, operating upon a human mind, the integrity of which is destroyed or impaired by disease, except, perhaps, in cases where the imaginary state of facts, if real, would excuse or justify the act done under their influence."

The decisions in these cases are by exceedingly able courts, and all the opinions are to be commended for their vast research and great learning. The opinions of the New Hampshire and Alabama courts, for the most part, are in harmony with the views expressed by many physicians in their treatises on medical jurisprudence of insanity. Ray, Medical Jurisprudence of Insanity, p. 43, § 27, *et seq.;* Dr. James Hendrie Lloyd, on Insanity, 1 Wharton & Stille's Medical Jurisprudence, chap. 27, pp. 539 *et seq.* 572; 1 Clevenger's Medical Jurisprudence of Insanity, p. 19 *et seq.* 26; Beck's Medical Jurisprudence of Insanity, vol. 1, pp. 793 to 798.

It is not surprising to find these learned medics, who have written upon the subject of insanity, strictly from the scientific viewpoint of the physician and alienist, repudiating all legal rules or tests that have been announced, and insisting that the whole question is one of fact to be determined by the jury, without any legal rules or tests to guide them. In short, it is not surprising to

find these authors on medical jurisprudence approving and insisting upon the doctrine as expressed by the New Hampshire court, above. But medicine is not an exact science, and doctors themselves have been generally found, in given cases, to differ widely in their opinions as to whether certain manifestations of mental aberration constitute a disease of the mind of which the crime charged is the product. They confessedly agree that they themselves are unable, from the medical viewpoint, to announce any practical tests for determining whether a mental disease exists that shall render one irresponsible for crime. Furthermore, doctors are not supposed to be as familiar with the principles and rules of law as lawyers and judges.

Speaking on this subject, Mr. Bishop says: "Doctor Ray, on the other hand, in his excellent and useful volume, has undertaken to treat of the legal branch, with the medical; and he has most soundly cudgeled the judges, on account, chiefly, though perhaps not wholly, of his own failure to understand them. When they, for example, have laid down a doctrine in reference to the particular facts under consideration, he has taken the doctrine in a general sense; and then, by representing how far from just it is when applied to other circumstances, not under consideration, has shown up the judges, whom he has not intended to treat unfairly, in a very unfavorable light. Thus he made various adjudications of the courts, on this subject, appear to be bundles of inconsistencies and absurdities; and the law, in many respects, as practically expounded, anything but just and reasonable. And we need not wonder at this, when we reflect how difficult it is for men in any one profession to comprehend what belongs to another, with which they are entirely unfamiliar." (Quoted in Elwell's Malpractice, Medical Evidence and Insanity, p. 370.)

Criticising the critics of his profession who have condemned all legal rules or tests for determining whether mental disease constitutes a defense to crime charged, Dr. D. Meredith Reese says: "The profession of law, in

view of our reciprocal relations and mutual responsibilities, are entitled to an intelligible explanation, if not a scientific definition, as well as some reliable test, on which they and we can rely, as characterizing those forms and degrees of insanity which are to be recognized as exempting from responsibility to the laws of the land, especially in criminal cases. It is only in the absence of any medical definition or test, our profession having failed to furnish either, that the bench has been appealed to by the bar for such test. Hence, the recorded decisions of courts in every country have, with singular uniformity, concurred in the 'knowledge of right and wrong,' at the time of its commission, as the definition and test of insanity for the guidance of juries. But many in our profession have been ever remonstrating against these legal decisions as defective and erroneous, and alleging that such 'knowledge' is often possessed by the insane, who are unquestionably such. Still, however, we declare ourselves wholly unprepared to lay down any other or better rule of judgment; nor is there any other definition or test upon which the medical profession have ever agreed. Our highest authorities seem to content themselves with denying that any definition is practicable, or any test conclusive, although every medical sciolist and tyro expects his *ipse dixit* to be infallible, and the bench, the bar, and the jury are all profoundly to cower before a medical certificate of insanity, and the dictum of a professional man that the solemn judgment of the fifteen judges of Great Britain and the House of Lords, as to irresponsible insanity, is 'absurd and nonsensical.' " See Elwell on Malpractice, Medical Evidence and Insanity, p. 371.

Physicians, for the reasons above stated, could not be expected to know exactly what was decided and what was not decided by the judges in *McNaghten's Case,* nor to correctly understand and interpret the rules as announced by the judges in that case. Hence, it is not to be wondered at that they should have condemned those rules as unsound, and should be found heartily approving of the New Hampshire doctrine that there are no legal rules or

tests.   But, while such is the case with physicians, it is a
matter of surprise that the erroneous views of these doc-
tors should have been voiced by any of the learned courts
in this country.   That such, however, is the case is shown
by the decisions of the Supreme Court of New Hampshire,
and by some of the comments of the Supreme Court of
Alabama, in the cases above referred to.   See, also, *Ste-
vens* v. *State*, 31 Ind. 485, 490.

Strange to say, the Supreme Court of Alabama, after
criticising the rules in *McNaghten's Case* as though these
rules undertook to declare the whole law with reference
to monomania or partial insanity, and after approving
what was said by the New Hampshire court, to the effect
that ''courts have undertaken to declare that to be law
which is matter of fact,'' thus practically endorsing the
view of the New Hampshire court, nevertheless concludes
its opinion as follows:   ''The inquiries to be submitted to
the jury, then, in every criminal trial where the defense
of insanity is interposed, are these:   Was the defendant
at the time of the commission of the alleged crime, as mat-
ter of fact, afflicted with a disease of the mind, so as to be
either idiotic, or otherwise insane?   If such be the case,
did he know right from wrong as applied to the particular
act in question?   If he did not have such knowledge, he
is not legally responsible.   If he did have such knowledge,
he may nevertheless not be legally responsible if the two
following conditions concur:   (1) If, by reason of the
duress of such mental disease, he had so far lost the power
to choose between the right and wrong, and to avoid doing
the act in question, as that his free agency was at the time
destroyed.   (2) And if, at the same time, the alleged
crime was so connected with such mental disease, in the
relation of cause and effect, as to have been the product
of it solely.''

Now, we agree with the Alabama court that these are
proper inquiries to be submitted to the jury.   These, in
substance, embody the rules in *McNaghten's Case*, and
the further rule that when the crime is the product of an
irresistible impulse, growing out of the disease of the

mind, that the accused would not be responsible. These are, in substance, the legal rules or tests declared by us in *Bell* v. *State, supra,* where we cited approvingly *Parsons* v. *State, supra,* as announcing these rules.

While we concur with the Alabama court in its conclusion as to the proper inquiry to be submitted to the jury, we submit, with all due deference to that court, that the judges in *McNaghten's Case,* by the specific questions that were propounded to them by the House of Lords, were not called upon to decide whether or not one who is afflicted with an insane delusion in respect to one or more particular persons or subjects would be responsible for a crime alleged to have been committed by him which was the product of an irresistible impulse, growing out of the insane delusion. This question might properly have been submitted to the judges for their decision, because the facts in *McNaghten's Case* were typical of the disease of paranoia that had progressed to its secondary stage of suspicion and persecution. But these facts were not brought by the House of Lords before the judges. On the contrary, only certain specific questions of law were propounded to the judges, and the separate opinion of Mr. Justice Maule, as well as the opinion of Chief Justice Tindal, show that they undertook to answer only the questions propounded to them. Justice Maule, speaking for himself, said: "I feel great difficulty in answering the questions put by your lordships on this occasion: First, because they do not appear to arise out of, and are not put with reference to, a particular case, or for a particular purpose, which might explain or limit the generality of their terms, so that full answers to them ought to be applicable to every possible state of facts, not inconsistent with those assumed in the question."

Lord Chief Justice Tindal, speaking for the other judges, said: "My Lords, her Majesty's judges, in answering the questions proposed to them by your Lordships' House, think it right, in the first place, to state that they have forborne entering into any particular discussion upon these questions from the extreme and al-

most insuperable difficulty of applying those answers to cases in which the facts are not brought judicially before them. The facts of each particular case must of necessity present themselves with endless variety, and with every shade of difference in each case. * * * They have, therefore, confined their answers to the statement of that which they hold to be the law upon the abstract questions proposed by your Lordships."

A most critical examination of *McNaghten's Case* will disclose the fact that the judges, in their answers to questions propounded by the House of Lords, nowhere "ignore the possibility of crime being committed under duress of an insane delusion operating upon a human mind the integrity of which is destroyed or impaired by disease." Nor does it follow from any of these answers that "the only possible instance of excusable homicide in cases of delusional insanity would be where the delusion, if real, would have been such as to create in the mind of a reasonable man a just apprehension of eminent peril to life or limb," etc.

It appears, therefore, that the Alabama court wholly misapprehended the effect of the rules announced by the judges in their answers to the questions propounded to them by the House of Lords in *McNaghten's Case.*

Sir Fitzjames Stephen, who was himself an eminent judge, and one of the most able and brilliant law writers, in his great work on the History of the Criminal Law of England, in commenting upon the answers of the judges in *McNaghten's Case,* among other things, says: "Two things, however, must be noticed with respect to them. In the first place, they do not form a judgment upon definite facts proved by evidence. They are mere answers to questions which the judges were probably under no obligation to answer, and to which the House of Lords had probably no right to require an answer, as they did not arise out of any matter judicially before the House. In the second place, the questions are so general in their terms, and the answers follow the words of the questions so closely, that they leave untouched every state of facts

which, though included under the general words of the questions, can nevertheless be distinguished from them by circumstances which the House of Lords did not take into account in framing the questions.''

''The difficulty which these questions and answers suggest and leave untouched is this: How would it be if medical witnesses were to say (as Doctor Griesinger says, and as the witnesses in *McNaghten's Case* said in substance) that a delusion of the kind suggested never, or hardly ever, stands alone, but is in all cases the result of a disease of the brain, which interferes more or less with every function of the mind, which falsifies all the emotions, alters in an unaccountable way the natural weight of motives of conduct, weakens the will, and sometimes, without giving the patient false impressions of external facts, so enfeebles every part of his mind, that he sees, and feels, and acts with regard to real things as a sane man does with regard to what he supposed himself to see in a dream.'' History of the Criminal Law of England, Stephen, vol. 2, pp. 154, 157.

It will thus be seen that in the opinion of Sir Fitzjames Stephen the answers of the judges in *McNaghten's Case* left untouched the question of irresistible impulse. That the judges did not intend by their answers to exclude the doctrine of ''irresistible impulse'' as a defense, is further shown by the fact that Lord Denman was one of the judges who helped to formulate the rules of *McNaghten's Case*. As Lord Chief Justice of the court of Queen's Bench in the case of *Reg.* v. *Oxford*, 9 Car. & P. 525, he had charged the jury in part that: ''If some controlling disease was in truth the acting power within him, which he could not resist, then he will not be responsible.'' Having such views, if he had thought the rules in *McNaghten's Case* conflicted with same, he would doubtless have so expressed himself in a separate opinion. Yet, in the opinion of the Alabama court these answers excluded the doctrine of irresistible impulse, for, says that court, ''One of the rules in *McNaghten's Case* ignores the possibility of crime being committed under the duress of in-

sane delusion." The judges did not ignore the doctrine of irresistible impulse, but simply did not decide that question because they were not asked to decide it. Therefore, we reach the conclusion that this criticism by the Alabama court of the rules in *McNaghten's Case* is wholly without merit.

Speaking of this phase of the decision of the Alabama court, Mr. Stewart, in his work on Legal Medicine, page 411, says: "A careful reading of the opinion of the judge in this case shows that it depends mainly for its support upon the views expressed by writers on medical jurisprudence, who, in most cases, write from the standpoint of the physician, and that the authorities cited from the decisions of other courts are mainly criticisms of the rule or attempts by words rather than by principles to escape a strict application of the rule in a particular case. * * * This case does not state the law as it is announced by the great majority of the courts in this country and in England."

About 1676 Sir Matthew Hale had said: "There is a partial insanity of mind, and a total insanity. * * * Some persons that have a competent use of reason in respect of some subjects are yet under a partial dementia in respect of some particular discourses, subjects, or applications; or else it is partial in respect or degrees." 1 Hale's Pleas of the Crown, chap. 4, p. 30.

In 1838 Doctor Esquirol, a celebrated French alienist, introduced the term "monomania" to denote a class of the insane who were supposed to be alienated only on one idea. The intellectual disorder described by him was confined to a single object, or to a limited number of objects, and "apart from this disorder these patients think, reason and act like other men." 1 Wharton and Stille's Medical Juris., p. 822.

Accepting the high authority of one of the members of their own profession (Doctor Esquirol, the distinguished alienist) it does not seem that the physicians had seriously, if at all, challenged the existence of partial insanity or monomania in 1843 when the rules of *McNagh-*

*ten's Case* were announced. Thus this view had obtained for about one hundred and seventy years. Therefore, the House of Lords assumed as an established scientific fact that there was such partial insanity or monomania, and hence one of the questions propounded to the judges: "What is the law respecting alleged crimes committed by persons afflicted with insane delusion, in respect of one or more particular subjects or persons?" Of course, as all good judges should do, they confined their answers closely to the questions propounded.

As early as 1828 Lord Lyndhurst announced in *Dew* v. *Clarke*, 5 Russ Chy. 164-167, that "to be sane, the mind must be perfectly sound, otherwise it is unsound." And in 1848 Lord Brougham, in *Waring* v. *Waring*, 13 English Reports (VI Moore), 342, repudiated the doctrine of the existence of partial insanity or monomania, and treated the mind as an integer. He says: "For we must keep always in view that which the inaccuracy of ordinary language inclines us to forget, that the mind is one and indivisible. * * * If the being, or essence, which we term the mind, is unsound on one subject, it is quite erroneous to suppose such a mind really sound on other subjects."

Again, "But the malady is there, and as the mind is one and the same, it is really diseased, while apparently sound, and really its acts, whatever appearance they may put on, are only the acts of a morbid or unsound mind." Modern psychiatry, say certain of the doctors, has demonstrated that the theory of Lords Lyndhurst and Brougham is correct.

But while discarding the old idea and the old terms of "partial insanity" and "monomania," the physicians who have written treatises on the subject of Medical Jurisprudence, nevertheless recognize the fact that there is a disease of the mind characterized by systematized delusions concerning a single object or a limited number of objects. They have adopted the term "paranoia" which, says Doctor Lloyd, "has only lately come into general use in psychiatry for the special form of insanity here described. It was adopted as a protest against the further

use of the word "monomania," a term which has been so abused and misunderstood as to have lost many of its rights to exist." The learned author then proceeds to present a picture of what is meant by paranoia as follows: "This form of insanity is characterized by systemized delusions such as have been described, but these delusions present themselves in a particular manner of evolution." He then describes the stages of the disease and the description shows that the victim of the disease in its first stage, although possessed of delusions, may still be able to control his actions with reference to those delusions. His general power of self-control has not yet been destroyed. Hence the rule that such a one must be considered, so far as the administration of the criminal law is concerned, in the same situation as to responsibility as if the facts with reference to his delusion were real. 1 Wharton & Stilles, Med. Jur., p. 827, secs. 1031-31a.

For all practical purposes it is wholly immaterial whether "the partial insanity" of Sir Matthew Hale, the "monomania" of Doctor Esquirol, or the "paranoia" of the modern psychiatrist be used to describe that disease or condition of the mind characterized by systematized delusions concerning a single object or a limited number of objects. The important scientific fact upon which alienists seem to agree is that there is such a disease of the mind and whether the disease be designated "partial insanity," "monomania," or "paranoia" in its first stage of development, apart from the subject matter of the delusion growing out of the disease, its victims concerning other objects apparently reason and act as men whose minds are in a normal condition.

The *McNaghten* rules were announced in answer to questions propounded by the House of Lords requesting the judges to declare the law of England as to "alleged crimes committed by persons afflicted with insane delusion, in respect of one or more particular subjects or persons." *McNaghten's Case, supra.*

Thus the questions and the answers assumed as a fact that a person might be insane upon "one or more

particular subjects or persons.'' Although this idea had prevailed since the days of Sir Matthew Hale, and obtained in England when the *McNaghten* rules were announced, it now appears that some distinguished authors on medical jurisprudence have come to the conclusion, following the lead of Lords Lyndhurst and Brougham, that, as a scientific fact, it is impossible for a person to be ''insane upon one or more particular subjects or persons, without being insane upon all.'' Hence they say the rules of *McNaghten's Case* are wrong and should be wholly ignored. Now it does not follow that the *McNaghten* rules are unsound, even though there be no such thing as partial insanity. The doctrine that the mind is an integer, and, if unsound upon one subject from disease is unsound upon all, was announced by Lords Lyndhurst and Brougham in civil cases concerning the capacity to make a will. We have not approved the doctrine to that extent in civil cases. *Seawel* v. *Dirst,* 70 Ark. 166-174.

(3) In the best organized and most highly civilized states and nations the supreme power prescribes rules for the regulation of the conduct of the people which are intended to be equal, impartial, and therefore just. These rules or laws command certain things to be done and forbid the doing of certain things. To secure obedience to these rules or laws punishments are provided for the infraction of the same. When one who has the mental capacity to know the nature and quality of the act he is doing, and that the act is wrong, and who has the power of choice and action, violates these laws such one is punished as an act of retributive justice, in order that the interest of society may be protected and government maintained. Herein lies the basis of criminal jurisprudence. It is an intensely practical science and must deal with the subject of insanity, when pleaded as a defense to violated law, in a practical way. ''The law is not a medical or metaphysical science. Its search is after those practical rules which may be administered, without inhumanity, for the security of civil society, by protecting it from crime.'' Bushwell on Insanity, page 6, Preface.

There is a twilight zone in which it is most difficult to distinguish between the idiosyncracies of some minds free from disease and the manifold vagaries of the insane. The sane as well as the insane have delusions. ''The lunatic, the lover and the poet are of imagination all compact.''

It is apparent, says Mr. Bishop, ''that there are numerous shades or degrees of sanity and insanity, blending with one another, and separated by no distinct lines. And since the law regards not small things, it follows, that not every little cloud, floating over an otherwise illumined understanding, will exempt from criminal responsibility; nor, on the other hand, will every glimmering of reason, over the dark waters of a troubled mind, subject the unfortunate being to the heavy pains provided for wilful wrong-doing.'' As quoted by Elwell on Malpractice, Medical Evidence and Insanity, page 369.

Says Mr. Wharton, ''The mere fact that a person is insane does not, *per se,* relieve him from criminal responsibility. A slight departure from a well-balanced mind can not be recognized as insanity in the administration of criminal law, though it might be pronounced insanity in medical science.'' Wharton & Stille's Medical Jurisprudence, p. 179.

(4) The learned authors on Medical Jurisprudence and the very few courts who have adopted the view that in the trial of criminal cases where the defense of insanity is set up, the entire question of responsibility is to be left to the jury with no other instructions than that if the act was the product of mental disease they should acquit, otherwise convict, have been led into this egregious error, as we take it, by treating insanity and irresponsibility as if they were convertible terms. By so doing they treat the entire issue in criminal cases, where the defense of insanity is set up, as one of fact, whereas the real issue in such cases is a mixed one of law and fact. It is an issue of fact for the jury to determine whether the accused at the time of the alleged act was afflicted with a mental disease, and an issue of law as to whether the mental disease is such

as will render him irresponsible. Therefore, the issue of responsibility or irresponsibility in such cases should be submitted to the jury under proper instructions. Wharton & Stille's Med. Juris., p. 182.

Sir James Fitzjames Stephen says: "The question, 'What are the elements of responsibility?' is, and must be, a legal question. It can not be anything else, for the meaning of responsibility is liability to punishment; and if criminal law does not determine who are to be punished under given circumstances, it determines nothing." History of the Criminal Law of England, vol. 2, p. 183.

There is much practical wisdom in his observations as follows: "I can not see why such impulses, if they constitute the whole effect of the disease, should excuse crime any more than other sudden and violent temptations. A man whose temper was intensely exasperated by suppressed gout would not be excused for any act of violence which he might commit in consequence. If the disease were some obscure affection of the brain producing feelings similar in all respects, and leaving his general power of self-control equally unaffected, why should he be excused merely because his complaint was classed as a form of madness?"

Celebrated as are the authors on Medical Jurisprudence, and able and learned as are the judges who have announced a contrary view, in the language of Judge Wharton, "it can not be sustained on reasons either psychological or judicial." The subject is one of vast importance in the administration of the criminal law. If the doctrine of the New Hampshire court should be adopted throughout the American Union it would be nothing short of a national calamity, because that innumerable multitude of mental aberrants, commonly called cranks, would then find, over the insanity route, an easy path to immunity from any crimes they might commit. Hence the only safe and practical way of dealing with the subject is found in the legal tests or rules as formulated and declared in *McNaghten's Case,* as far as they go, and by an addition thereto of the doctrine that irresistible im-

pulse will excuse when caused by disease of the brain. All of which has been recently announced by us in the case of *Bell* v. *State, supra.* In addition to the authorities there cited, see also *DeJarnette* v. *Commonwealth,* 75 Va. Reports, p. 867, which contains an admirable statement of the law. These legal rules for determining the issue of guilt or innocence, where the defense is insanity, give the jury a simple and definite guide, announced by those learned in the law, and they cover every possible phase of testimony that may arise in any case. This is far wiser than to leave the jury in a realm of speculation, to determine for themselves whether there is a mental disease of a character that will excuse for the crime charged. These rules are humane and just to the accused and at the same time afford that protection against criminals which is absolutely essential to the best interests of society.

(5) It follows that the court erred in not modifying the twenty-fourth prayer for instruction, granted at the instance of the State, in accordance with the request of counsel for the appellant. The instruction when thus modified would have made the charge complete and harmonious, and in conformity with the law as announced by us in *Bell* v. *State, supra.*

(6) The court also erred in admitting the testimony of nonexpert witnesses who gave their opinion as to the sanity of the accused without stating any facts upon which they based their opinion and without showing that they were qualified to express such an opinion by stating the facts upon which such opinion was based. The questions propounded called for an inference from what the witness failed to see and not for an opinion based upon what he had seen and detailed. *Bolling* v. *State, supra; Schuman* v. *State,* 106 Ark. 362; *Dewein* v. *State,* 120 Ark. 311.

We find no other reversible errors in the record, but for those above indicated, the judgment is reversed and the cause remanded for a new trial.