Leslie David HILL *v.* STATE of Arkansas

5512                                    458 S. W. 2d 45

Opinion delivered September 28, 1970

*W. B. Howard and Jack Segars,* for appellant.

*Joe Purcell,* Attorney General; *Melton Lueker,* Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. Leslie David Hill shot and killed Willie Young and was convicted of first degree murder in the Craighead County Circuit Court. His defense was based upon insanity and upon conviction he was sentenced to the Arkansas penitentiary for life. On appeal to this court, Hill relies on the following points for reversal:

> "The Court erred in excluding appellant's offer of proof of opinion testimony from lay witnesses on the issue of appellant's sanity.
>
> The Court erred in giving Court's Instruction Number 9A."

We are of the opinion that the trial court erred on both points, and that this case must be reversed and remanded for a new trial.

Ark. Stat. Ann. § 41-2205 (Repl. 1964) defines murder in the first degree as follows:

> "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate, malicious and premeditated killing, or which shall be committed in the perpetration of or in the attempt to perpetrate, arson, rape, robbery, burglary or larceny, shall be deemed murder in the first degree."

The information under which Hill was tried, charged that he,

> ". . . did on the 34th day of November, 1968, in the Jonesboro District of Craighead County, Arkansas,

unlawfully, feloniously, willfully, knowingly and with malice aforethought and after deliberation and pre-meditation, assault, kill and murder one Willie Young by then and there unlawfully, feloniously, willfully, deliberately, knowingly and maliciously shooting him, the said Willie Young, with a deadly weapon, namely a pistol, then and there had and held in the hands of the said LESLIE DAVID HILL, with the felonious intent then and there to kill and murder, against the peace and dignity of the State of Arkansas."

The facts surrounding the actual homicide will not be set out in detail, but the appellant Hill and the decedent Young, together with several other individuals, were engaged in a dice game in the kitchen of a private home belonging to A. V. "Pete" Vann. An argument arose between appellant Hill, who had placed a bet, and decedent Young, who was "running the game," as to whether a third individual had made a certain point in rolling the dice. After some argument, Young offered to give the money to Hill but instead of taking the money Hill shot Young several times with a pistol. The evidence indicates that Hill then took another pistol, either from his own pocket or from Young's pocket, and after starting to leave the room, returned and fired several more shots from that pistol into Young's body remarking as he did so that he might as well do a good job of it.

The evidence in behalf of Hill shows that he served two years in the army from 1943 to 1945 and was drawing total disability veterans benefits under a diagnosis of schizophrenia, for which condition he was apparently discharged from the army. He was judicially declared incompetent in 1947 and has remained under guardianship since that time. The record discloses that on May 12, 1947, the appellant was examined by the veteran's administration medical staff and diagnosed as "Dementia Praecox, with complete industrial incapacity." One month later, on June 25, 1947, his veteran's administration record shows a medical diagnosis as

follows: "Dementia Praecox (paranoid tendencies shown on current exam)."

The appellant's first point has to do with the testimony of witnesses Alex Turnage, A. V. "Pete" Vann, Lonnie Cooper and Bert Jamison. In support of his first point the appellant relies heavily on our opinion in *Shaeffer* v. *State,* 61 Ark. 241, 32 S. W. 679. In *Shaeffer* we said:

"When a person's mental condition or capacity is in question, the opinions of witnesses, who are not experts, as to such capacity are only admissible in evidence, when taken in connection with the facts upon which such opinions are based. Before such evidence can be admissible, 'the specific facts upon which the opinions are based must first be stated by the witnesses, or their testimony must show that such intimate and close relations have existed between the party alleged to be insane and themselves as fairly to lead to the conclusion that their opinions will be justified by their opportunities for observing the party.' In other words, the opinion of such a witness is not admissible in evidence until it be first shown by his own testimony that he has information upon which it can reasonably be based. Whether the information is sufficient for that purpose is a question for the court to decide before it can be admitted. After its admission, the weight to be given is determined by the jury."

Turnage testified that he had known Hill for 25 or 30 years; that at one time they roomed together, and that throughout their acquaintance they had visited in each others homes. He testified that Hill

". . . was kind of a quick tempered fellow. He would fly off the handle most any little thing he got any argument over or anything being brought up. He was pretty strange. He did a lot of things —if you would go along with his program, everything was fine, but if you didn't he would

suddenly turn on you. I know a lot of cases where I would come in the house—I used to visit him at his own house and he would be leading a dog and the dog wasn't there. Then he would whistle 'Come on, Sport,' and the dog was not there. * * * He would say 'Don't pay me no 'tention. You don't see that little old dog?' I said 'No.' He would tell me about things, about hearing voices— * * * Oftentimes we would be together and he said 'Say, didn't you hear that voice say that,' and often talk about the little green man. I didn't know what he was talking about. That was eight or nine years ago. He would talk with—commute with—talk with them. * * * The little green man would tell him ever so often he had to kill somebody. I wouldn't go into details what he said. That is kind of embarrassing. * * * If we would hold a conversation about ten or fifteen minutes he would either start talking about he had to kill somebody or somebody talking to him, talk rumbling through his head. * * * [W]e would be watching a ball game when things was not funny, he would commence laughing; watching a t.v. program. I would just get up a lot of time and cut away from him because I couldn't comprehend what he was interested in, so forth. * * * The day he shot Willie Young, he had kind of a smirky smile on his face."

This witness was then asked the following questions and made the following answers:

"Q. Alex, based upon your association with Leslie over the years, your observation of his conduct, his manner and his demeanor, do you have an opinion with reference to whether Leslie was sane or insane on the day of this killing?

A. Well, I always did myself think that he was crazy.

Q. You always did think he was crazy?

A. Yes, sir.

Q. And you thought he was crazy on that day, is that right?

A. Yes, sir.

Q. Alex, based upon your observation of this boy over the years, what you saw him do, what you heard him say, that sort of thing, do you think he knew the difference between right and wrong on the day he killed Willie Young?"

The state objected to this question and the trial court ruled as follows:

"The Court is going to sustain State's objection to this lay witness answering questions whether or not the defendant knew the difference between right and wrong on the date of the alleged offense."

Hill then made his offer of proof as follows:

"Q. Alex, based upon your observation of Leslie, your association with him, your contacts with him over the years, do you believe Leslie knew the difference between right and wrong on the day he killed Willie Young?

A. No, I don't.

Q. You don't believe he knew the difference between right and wrong on the day he killed Willie Young?

A. No, sir, I don't.

Q. Basing your answer again on your association with Leslie, observation of him over the years, numerous contacts you had with him, tell the Court whether in your opinion Leslie Hill had the ability to resist doing wrong?

A. I don't think Leslie Hill at any time could

resist doing wrong because he would go into spasms, fits, so forth. If a person really didn't observe and know him, be around him, he wouldn't really know him. He was a misleading fellow. You just had to know his actions, the way he did things."

We are of the opinion that sufficient foundation was laid in the testimony of lay witness Alex Turnage to permit him to express an opinion as to whether Hill knew the difference between right and wrong on the date of the alleged offense.

We are of the opinion, however, that the court properly excluded the opinions of all the lay witnesses as to Hill's *ability to resist* doing wrong. The appellant has cited no case, and we have found none, where lay witnesses are permitted to express an opinion as to another individual's ability to resist doing wrong without some knowledge of the nature and strength of the opposing force against which his resistance is directed.

A. V. "Pete" Vann testified that he had known Hill 15 or 20 years and they associated together frequently. He testified that on one occasion Hill told him that there were some "guys" around the house the night before "said they were going to get him; going to kill him."

"Q. I wish you would state whether or not Leslie ever made a statement to you or in your presence with reference to hearing voices?

A. Well, no more than he tell me he would hear people around the house there, going to get him."

This witness testified that he had seen Hill grin and that on one occasion in Marked Tree he grinned and asked the witness if he had his gun, because a group of men were picking on him. He testified that he saw Hill threaten Turnage with a gun on the day he

killed Young. On the basis of this testimony, the following question was asked:

"Q. Now, Pete, based upon your association with Leslie over the years, your observation of his manner and demeanor, and his conduct, do you have an opinion with reference to whether Leslie was crazy or not on the day that he killed Willie Young down there?"

The state's objection to the question was sustained, and we agree with the trial court that there was not sufficient foundation laid in A. V. "Pete" Vann's testimony on which he could form an evidentiary opinion as to whether Hill was "crazy or not" on the day he killed Willie Young.

Lonnie Cooper testified that he was former sheriff and jailer of Craighead County and had known Hill since about 1950. He arrested Hill and had him in jail on several occasions. He testified that Hill told him that someone was after him; that nobody liked him and that he heard voices talking to him. As to this witness, the record is as follows:

"Q. Lonnie, could you estimate how many times you have been in contact with this boy?

A. I would say several.

Q. Would it be as many as twenty?

A. Well, I would say ten or twelve, personally, I talked to him.

Q. Lonnie, do you have an opinion based on your association with Leslie, your observation of his manner and demeanor, with reference to whether he was sane or insane on those occasions?

MR. PEARSON: If the Court please, with all re-

spect to Mr. Cooper and his ability, I do feel I would have to object to this non-expert lay witness express his opinion as to sanity or insanity of the defendant based on the facts put in this record. I don't think he had sufficient opportunity to observe and associate with this defendant to express a reasonable opinion on sanity or insanity. I object to the lay opinion."

The state's objection was sustained and Hill then made his offer of proof as follows:

"Q. I believe at the time the Court sustained the objection, and now that the jury has retired and we are outside the presence of the jury, I believe at that time while the jury was still here, I asked you the question whether you had an opinion with reference to whether Leslie Hill was sane or insane on the occasions when you contacted him. Do you have such an opinion, sir?

A. Could I answer it this way? We have talked about it among ourselves—the officers—to put it in plain English, we always thought he was crazy.

Q. Well, that is not responsive to my question. I think it covers it generally, but after having made that statement, if I understand you correctly, you were of the personal opinion during these periods you were contacting him he was crazy?

A. That's right."

We are of the opinion that the official capacity in which former Sheriff Cooper dealt with Hill added some quality to his observations over that of relatives and friends, and that former Sheriff Cooper was qualified to give his opinion in evidence as to Hill's sanity on the ten or twelve occasions he talked to him.

We agree with the trial court that there was not sufficient foundation laid in Bert Jamison's testimony for his lay opinion to be accepted in evidence as to Hill's sanity.

We now turn to the facts surrounding appellant's second point. Instruction No. 9A, of which appellant complains, is as follows:

"The fact that one's reason is temporarily dethroned by anger, jealousy, or any other passion, *or the fact that one has become suddenly depraved to such an extent that his conscience ceases to control or influence his action is not a defense to a criminal charge.* In other words, what is commonly known as emotional or moral insanity, is not a defense under the law of this state for one charged with crime." (Emphasis supplied).

As pointed out by the state, this instruction was apparently lifted verbatim from our decision in *Watson v. State,* 177 Ark. 708, 7 S. W. 2d 980, but the fallacy lies in the fact that in *Watson,* the trial court did not give a *separate* instruction on emotional or moral insanity, and the objection in that case went to the alleged failure to include the definition of "emotional or moral insanity" in the entire instruction that was given. We simply held in *Watson* that "emotional or moral insanity" was properly defined in the instruction that was given. In *Watson* we only approved the definition as included in the instruction that was given, and we did not approve the definition as a separate instruction. The entire instruction in the *Watson* case is not set out in the opinion, but on the point raised in that case we said:

"The instructions on the issue of insanity followed closely the law applicable to such issue as declared by this court in *Bell* v. *State, supra.* It could serve no useful purpose to reiterate the law announced in that case and in *Hankins* v. *State, supra.* The appellant objected generally to the instruction given

by the court, and specifically to that part of the instruction relating to emotional and moral insanity. The appellant contends that there was no definition of emotional or moral insanity. But on examination of the instruction we find that the court in the instruction told the jury that 'the fact that one's reason is temporarily dethroned by anger, jealousy or any other passion, or the fact that he has become suddenly depraved to such an extent that his conscience ceases to control or influence his actions, is not a defense to criminal charge. In other words, what is commonly known as emotional or moral insanity is not a defense under the law of this State for one charged with crime.' The instruction on the proposition of emotional and moral insanity thus conformed to the law as declared by the court in *Bell* v. *State, supra,* and was a sufficiently explicit definition of emotional and moral insanity."

Turning to *Bell* v. *State,* 120 Ark. 530, 180 S. W. 186, referred to in *Watson,* we find the following:

"The law on the issue of insanity may be briefly stated as follows: The law presumes that every man is sane and that he intends the natural consequences of his act. Therefore, where one is charged with murder in the first degree, and it is admitted that if sane he is guilty as charged, and the plea of insanity is interposed as his defense, in such cases the burden is upon the accused to establish his insanity by a preponderance of the evidence. * * * Where one is on trial for murder in the first degree and the State proves the killing under circumstances that would constitute murder in the first degree if the homicide was committed by a sane person, then if the killing is admitted and insanity is interposed as a defense such defense can not avail unless it appears from a preponderance of the evidence, *first,* that at the time of the killing the defendant was under such a defect of reason from disease of the mind as not to know the nature

and quality of the act as he was doing; or, *second,* if he did know it, that he did not know that he was doing what was wrong; or, *third,* if he knew the nature and quality of the act, and knew that it was wrong, that he was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done, and unable, because of the disease, to resist the doing of the wrong act which was the result solely of his mental disease.

* * * The first of the tests is applicable in every case where the evidence tends to show general insanity or dementia. The second and third of these tests are applicable in every case where the evidence tends to prove, as it does here, that the accused, at the time of the alleged criminal act, was afflicted with that disease of the mind termed by medical experts, alienists and authors on medical jurisprudence as *paranoia,* which has progressed to the 'stage of persecution.'

&ast; &ast; &ast;

But it must be remembered that one who is otherwise sane will not be excused from a crime he has committed while his reason is temporarily dethroned not by disease, but by anger, jealousy, or other passion; nor will he be excused because he has become so morally depraved 'that his conscience ceases to control or influence his actions.' In other words, neither so called 'emotional' nor 'moral' insanity will justify or excuse a crime. *Bolling* v. *State, supra.* It was the province of the court to make concrete application of these tests or rules to the facts adduced in evidence, and, guided by them, it was the province of the jury to determine whether or not the appellant was responsible for the crime charged."

Another statement in *Bell* which might be applied to the case at bar is as follows:

". . . Instead of the numerous instructions that were given, it would have been far better if the court, after announcing the law as to the burden of proof and declaring the above tests, had instructed the jury that if they believed from the preponderance of the evidence that the appellant was insance they should acquit him, otherwise they should convict him of the crime charged. If counsel had succinctly presented their respective contentions in a few plain prayers embodying the above tests, doubtless the errors that crept into the court's charge would have been avoided."

Instruction 9A in the case at bar has a similar defect as did an instruction complained of in *Hankins v. State,* 133 Ark. 38, 201 S. W. 832. In that case we said:

"Among other instructions the court gave the following: 'The court instructs the jury that even though you should believe from the evidence that the defendant was suffering from a delusion that his wife was too friendly with other men, and that defendant acted upon this delusion when he fired the fatal shot, yet this delusion would not justify the defendant in taking the life of his wife, nor excuse him from criminal responsibility.'

The appellant objected specifically to the giving of the above instruction, and requested the court to modify the same by adding the following: 'Unless you further find from a preponderance of the evidence that the defendant at the time of the act was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong; or if he knew the nature and quality of the act and knew that it was wrong, that he was under such duress of mental disease as to be unable because of the disease to resist the doing of the wrong act, which was the result solely of his mental disease.' "

In holding that the trial court erred in not modifying the instruction, this court said:

> "It follows that the court erred in not modifying the twenty-fourth prayer for instruction, granted at the instance of the State, in accordance with the request of counsel for the appellant. The instruction when thus modified would have made the charge complete and harmonious, and in conformity with the law as announced by us in *Bell* v. *State, supra.*"

Under the instruction 9A given by the trial court, the jury was told: ". . . the fact that one has been suddenly depraved to such an extent that his conscience ceases to control or influence his action is not a defense to a criminal charge. . ." This instruction eliminated from the jury's consideration one important element— the *cause* of such sudden depravity. In *Korsak* v. *State,* 202 Ark. 921, 154 S. W. 2d 348, we made it clear that such depravity, sudden or otherwise, may be a defense in a criminal case if it is caused by a *disease of the mind,* but not otherwise. In *Korsak* we said:

> ". . . If a man's mind becomes so diseased that he is insane (as that term is defined in numerous cases, such, for instance, as *Bell* v. *State,* 120 Ark. 530, 180 S. W. 186; *Hankins* v. *State,* 133 Ark. 38, 201 S. W. 832, L. R. A. 1918D, 784; *Watson* v. *State,* 177 Ark. 708, 7 S. W. 2d 980, 59 A. L. R. 356), even though the diseased condition of the mind resulted from private vices, he is excused. But, if his mind becomes disordered, so that he loses control of himself, through passion, suddenly or violently aroused, whether that passion be of an amorous nature or the result of hate, prejudice or a desire for revenge, he is not an insane person within the meaning of the law. For instance, a man might have a provocation, apparently sufficient to make the passion irresistible, and, under the influence of this passion, kill another. But he is not excused on that account. He would under § 2981,

Pope's Digest, be guilty of voluntary manslaughter. A man might voluntarily drink intoxicants, or voluntarily take drugs, until, while, under the influence of the intoxicant or the drug, he becomes irresponsible and unaware of his conduct. Yet, he is not excused from the effect of his conduct under those conditions.

\*     \*     \*

. . . He may be excused as an insane person only when his mind has become diseased and, because of this disease, he has lost the power to distinguish between right and wrong or, as the court told the jury in the instruction above copied, he is incapable, because of the diseased condition of his mind, of choosing between the right and the wrong.

But if one's conduct was not induced by this mental condition, but from the excitation of the lower passions, whether of hate, prejudice, desire for revenge, or lascivious desire, he is responsible for his act. Frenzy is not insanity."

Likewise, under instruction 9A in the case at bar, if a person should become suddenly depraved to such an extent that his conscience ceases to control or influence his action, he would still be criminally responsible for his depraved acts even if his conscience should become suddenly obliterated by malignant tumor or other disease with sudden manifestations.

The judgment is reversed and this cause remanded for a new trial.

FOGLEMAN, J., not participating.